MaddeN, Judge,
delivered tbe opinion of tbe court:
The plaintiff claims that in performing a contract with the Corps of Engineers of the War Department, it encountered changed conditions within the scope of Article 4 of its contract which caused it to incur extra expense for which the Government should have paid but did not.
The contract was made in July 1946. The plaintiff was to build an earthen dam across Canacadea Creek at Almond, Steuben County, New York. One item of the work was the blasting through rock of a tunnel some 710 feet long. The blasted area was to be approximately 17 feet in diameter and the finished bore after the construction of the concrete lining was to be 13 feet in diameter. All of the work under the contract was completed on time, the contract completion date, as extended, being June 30, 1949.
The Army Engineers had made test borings in. the area through which the tunnel was to be built. The invitation for bids, upon which the plaintiff had acted in submitting its bid, contained the standard provisions requiring the bidder to investigate the site and learn all that could be learned about the conditions which would be encountered in the per *502 formance of the contract. The plaintiff made a thorough examination of the nature of the rock, wherever it was exposed in the area, and of the logs of the test borings made by the Army Engineers. The logs of the borings indicated that, except for a distance of about fifty feet at each end of the tunnel, over which the rock covering would be relatively shallow, the rock through which the tunnel would pass would be “unweathered” rock, i. e. rock without seams in which clay or mud had accumulated. The importance of the un-weathered condition of the rock is that such rock would better remain in place in the roof of the tunnel without vertical support when the tunnel was blasted through.
The specifications contemplated instability of the rock for fifty feet at each end of the tunnel. They provided for the insertion in these locations of strong steel ribs set four feet apart, with steel “liner plates” one-eighth of an inch thick on top of them.
The plaintiff’s excavation subcontractor, experienced in tunnel work, blasted out the tunnel. A good deal of rock fell from above the required height of the tunnel. The fall from the blasting and the overbreak was “mucked” out by the night crew. No cribbing or other temporary protection against falling rock was used at this stage of the work. The blasting through of the tunnel was begun in December 1946 and finished by March 12, 1947, all in winter weather.
Because of the considerable excess fall of rock while the tunnel was being blasted through, the plaintiff requested the Government’s resident engineer to authorize the installation of steel ribs and liner plates through the entire length of the tunnel, this additional material to be paid for by the Government. The resident engineer replied that unless there were indications that the tunnel would cave in, such authority would not be given.
The plaintiff, in correspondence during the next several months, repeated its request, which the Government repeatedly denied. The plaintiff caused the situation to be examined by several experts. They found that, throughout the length of the tunnel, the rock contained seams filled with mud and clay; that these seams were saturated with water and offered little resistance to the fall of the rock when its *503 vertical support liad been removed. Since the tunnel had been blasted through in the winter when no moisture could enter the ground from the surface, which was about 100 feet above the tunnel, the rock was relatively stable at that time. "When the ground at the surface thawed and the spring rains came, the saturation of the seams in the rock occurred or was increased, as was the instability of the overlying rock.
In the disputation in the writings of the parties, the Government took the position that all that was needed was “temporary protection” sufficient to enable the workmen to safely clear out the tunnel and construct the concrete lining. If that was all that was needed, it was no more than the plaintiff had contracted to do, at its own expense. Such protection would, apparently, have been wooden cribbing, sufficiently strong to prevent a relatively small volume of rock from crashing to the floor of the tunnel.
The plaintiff’s contention was, and is, that the rock above the tunnel was so unstable that unless “permanent protection” was installed, of a kind which would have to remain imbedded in the concrete lining of the tunnel, not only would the workmen be endangered but the tunnel could not be completed because of the danger of large falls of rocks which would make it impossible or impracticable to properly construct the concrete lining.
On May 5,1947, the contracting officer formally notified the plaintiff that it was his decision that no additional steel tunnel lining would be authorized to be placed at the expense of the Government. The plaintiff, on May 29, filed an appeal from the contracting officer’s decision. It also renewed its request to the contracting officer for approval of the steel permanent protection which it proposed to use. On June 13, 1947, the contracting officer advised the plaintiff that it might install the proposed steel protection if it chose to do so, but that the Government thought that the installation was more expensive than was necessary; that nothing more than temporary protection, which the plaintiff was under a duty to furnish, was necessary; and that the Government would not pay the cost of either kind of protection. This letter suggested and recommended to the plaintiff a lighter and less expensive type of protection.
*504 The plaintiff in further correspondence, informed the contracting officer of the advice which it had received from expert consultants that the type of protection recommended by the contracting officer would be inadequate and unsafe. It then proposed a design, of steel protection, with detailed specifications, and requested approval of the design. On August 11, 1947, the contracting officer approved the use of the plaintiff’s design, saying, however, that it was unnecessarily strong and expensive and that the Government would not pay for it unless higher authority reversed his decision. 'The plaintiff then proceeded to install the permanent protection and completed the lining of the tunnel on May 8, 1948.
The Claims and Appeals Board denied the plaintiff’s appeal on December 14,1948.
The evidence does not tell us in detail what the process of constructing the lining of the top of the tunnel would have been, if only temporary protection had been installed, so that there would have been no steel ribs and lining plates to serve as a form for the lining. Presumably, removable wooden forms would have been used and the space above them would have been packed with rocks and concrete and the voids filled with cement grouting. The evidence seems to us to be quite overwhelming that, the condition of instability of the rock above the tunnel being what it was, it would not have been practicable to construct the lining of the tunnel by that method. There would quite certainly have been a large number of heavy rock falls during the several months of the construction of the tunnel lining, and the rearrangement of the fallen rocks and the packing of the voids in such a way that the arch of the tunnel would support the unstable weight above it, when the forms were removed, would have been a difficult if not an impossible task. All the risks of the success of this task would have fallen on the plaintiff, since it had contracted to construct a permanent and usable tunnel.
The plaintiff says, and we have found as a fact, that the weathered and unstable condition of the rock through which the tunnel was blasted was an unforeseen condition. The contract contained the usual Article 4 of Government con *505 struction contracts, relating to subsurface or latent unforeseen conditions. The Article is quoted in our findings of fact. The unforeseen condition having arisen, the Government was under a contractual duty to pay the plaintiff the cost of solving the difficulty. The contracting officials were adamant in their position that “temporary protection” would solve the problem. It is possible that it would have, but the evidence to the contrary was so strong that it would have been foolhardy of the plaintiff to proceed on the Government’s advice, but at the plaintiff’s own risk.
We get from the record the impression that the Government officials, in their correspondence with the plaintiff in the spring and summer of 1947, kept their minds almost exclusively upon the text of the contract, and paid little attention to the conditions in the tunnel. Those conditions had changed importantly after the spring thaw and rains had saturated the unforeseen clay and mud in the seams of the rocks. The communications of the Government officials kept harking back to the duty of the contractor to examine the site and the test borings and learn what could be learned about the difficulties which would be encountered. But the plaintiff had done that, and had not learned of the difficulties which in fact developed. The purpose of Article 4 of the contract was to insure the contractor against that very contingency.
The contract required the contractor to protect its workmen against harm from falling rocks, and to produce a safe, solid, usable tunnel. We think the Government officials felt that they could save the Government money and at the same time subject the Government to no risk, by standing on the terms of the contract . If the temporary protection which they insisted was sufficient did not produce a good tunnel, the contractor was still obligated to produce a good tunnel, and the Government could not lose by the experiment.
The Government urges that the plaintiff’s difficulties were of the plaintiff’s own making; that if it had proceeded immediately to line the tunnel after it had holed it through, the rock would not have been so unstable. The Government urges that the strong current of air which blew through the tunnel after it was holed through made the rock unstable, *506 and that the tarpaulin coverings over the openings were not sufficiently airtight. It would be difficult to maintain an airtight seal over the ends of a tunnel which was being worked in. And we think a current of air blowing through a tunnel, the roof of which was dripping with water, would have had no significant effect upon the stability of the rock in and above the roof.
The Government claims finality for the decision of the contracting officer, affirmed by the Claims and Appeals Board. Under the Act of May 11, 1954, 68 Stat. 81, the “Wunderlich Act”, that decision does not have finality unless it is supported by substantial evidence. We think that on consideration of all the evidence, the contracting officer’s decision cannot be said to have substantial support.
The Government urges that in this case the plaintiff did not present its case fully to the Claims and Appeals Board, since it presented only four witnesses before the Board, but presented fifteen witnesses at its trial in this court. The Government says that the plaintiff used the Board as a mere waystation in its progress to this court, and thus did not give the Board a fair chance to decide the case on substantially the same evidence which has been presented in this court. So far as concerns the difference in the number of witnesses, several of the additional witnesses in this court gave unimportant testimony. But some of the expert witnesses who did give important testimony in this court, did not testify before the Board.
In our opinion in Volentine and Littleton v. United States, 136 C. Cls. 638, holding that the trial in this court should not be limited to the record made before the contracting agency, but should be de novo, we recognized that there were logical weaknesses in our position. We concluded, however, that the intent of Congress in enacting the Wunderlich Act was in accord with our conclusion, and we adhere to that conclusion in this case.
The plaintiff claims that, in addition to the extra expense of installing the permanent steel protection in the tunnel, it was put to extra expense by being delayed by the contracting officer’s refusal for a considerable time to authorize it to install the permanent protection, The plaintiff says that the *507 delay threw the work of constructing the concrete lining of the tunnel into the winter months, so that it had to heat its concrete and incur other extra costs on that account. We have found that there was delay and expense resulting from the cause alleged by the plaintiff. F. H. McGraw and Company v. United States, 113 C. Cls. 29.
By stipulation of the parties, the instant proceeding has been limited to the decision of the question of liability. Our conclusion is that there is liability of the defendant to the plaintiff. The amount of the plaintiff’s recovery will be determined pursuant to Buie 38 (c).
It is so ordered.
McLaughlin, District Judge, sitting by designation; Whitakee, Judge/ and Jones, Chief Judge, concur.
Laeamoee, Judge, took no part in the consideration and decision of this case.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a corporation organized and existing pursuant to the laws of the Commonwealth of Massachusetts with its principal office and place of business in Framing-ham, Massachusetts.
2. On or about July 3, 1946, the plaintiff and the defendant, acting through the War Department, Corps of Engineers, as a result of competitive bids submitted, entered into a contract for the construction of an earthen dam across Canacadea Creek, Almond, Steuben County, New York. The work was to be performed in strict accordance with the specifications, schedules and drawings (which were prepared by the defendant) for an estimated consideration of $3,330,-330 based upon unit prices for the various categories of work items. The contract provided that work should begin within 10 days after receipt by the plaintiff of notice to proceed, and be completed not later than 900 calendar days after that date. The time for completion of performance was extended to June 30, 1949, by Modification No. 15. The *508 work was satisfactorily completed on that date and formally accepted on behalf of the defendant by the contracting officer by letter of July 20,1949.
3- Pursuant to Rule 38 (c), by stipulation between the parties hereto, the trial was limited to the issues of law and fact relating to the right of plaintiff to recover, reserving for determination by further proceedings, if necessary, the amount of recovery.
4. The contract specifications provided for the blasting through rock of a tunnel approximately 710 feet long for the diversion of water. Before placement of the concrete lining, the bore of the tunnel was approximately IT feet in diameter. The finished bore with concrete lining in place was 13 feet in diameter. This action was brought to recover increased costs which the plaintiff says it incurred by reason of changed conditions encountered which required the installation of steel tunnel protection in the form of steel arch ribs and liner plates throughout the length of the tunnel, and also by reason of alleged delays in the work because of the failure and refusal by the defendant to direct the installation of such support as a pay item.
5. Pertinent and material provisions of the plaintiff’s contract are as follows:
ARticle 4. Changed conditions. — Should the contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications, the attention of the contracting officer shall be called immediately to such conditions before they are disturbed. The Contracting Officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall with the written approval of the Secretary of War or his duly authorized representative, be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions.
Article 5. Extras. — Except as otherwise herein provided, no charge for any extra work or material will be *509 allowed unless the same has been ordered in writing by the contracting officer and the price stated in such order.
# H«
Aeticle 15. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto. In the meantime the contractor shall diligently proceed with the work as directed.
‡ * Hs *
ARTiole 25. Accident Prevention. — In order to protect the life and health of employees in the performance of this contract, the contractor will comply with all pertinent provisions of the “Safety Requirements for Excavation — Building—Construction” approved by the Chief of Engineers, December 16, 1941, as revised 15 March 1943 (a copy of which is on file in the office of the contracting officer) and as may be amended, and will take or cause to be taken such additional measures as the contracting officer may determine to be reasonably necessary for this purpose. The contractor will maintain an accurate record of and will report to the contracting officer in the manner and on the forms prescribed by the contracting officer, all cases of death, occupational disease and traumatic injury arising out of or in the course of employment on work under this contract. The contracting officer will notify the contractor of any non-compliance with the foregoing provisions and the action to be taken. The contractor shall, after receipt of such notice, immediately correct the conditions to which attention has been directed. Such notice, when served on the contractor or his representatives at the site of the work, shall be deemed sufficient for the purpose aforesaid. If the contractor fails or refuses to comply promptly, the contracting officer may issue an order stopping all or any part of the work. When satisfactory corrective action is taken, a start order will be issued. No part of the time lost due to any such stop order shall be made the subject of claim for extension of time or for excess costs or damages by the contractor.
6. Pertinent and material provisions of the specifications made a part of the contract are as follows:
*510 GC-3. SITE INVESTIGATION AND REPRESENTATIONS. — The Contractor acknowledges that be has satisfied himself as to the nature and location of the work, the general and local conditions, particularly those bearing upon transportation, disposal, handling and storage of materials, availability of labor, water, electric power, roads and uncertainties of weather, river stages, tides or similar physical conditions at the site, the conformation and condition of the ground, the character, quality a/nd quantity of surface and subswface materials to be encountered, the character of equipment and facilities needed preliminary to and during the prosecution of the worn [Italics supplied] and all other matters which can in any way affect the work or the cost thereof under this contract. Any failure by the Contractor to acquaint himself with all the available information concerning these conditions will not relieve him from responsibility for estimating properly the difficulty or cost of successfully performing the work. The Government assumes no responsibility for any understanding or representations made by any of its officers or agents during or prior to the negotiation and execution of this contract, unless (1) such understanding or representations are expressly stated in the contract and (2) the contract expressly provides that responsibility therefor is assumed by the Government. Representations made but not so expressly stated and for which liability is not expressly assumed by the Government in the contract shall be deemed only for the information of the Contractor and the Government will not be liable or responsible therefor.
*****
TP4-02. TUNNEL EXCAVATION. — a. Scope.— The tunnel bore may be driven from either or both ends by any of the usual methods of tunneling, provided the driving is continuous and progress is consistent with that indicated on the progress schedule. Temporary tunnel protection shall be provided where required for safety of the workmen and shall be placed progressively after each heading blast [Italics supplied] and prior to resumption of excavation and drilling operations. The tunnel shall be maintained free of water by means of drains and sump pumps. Tunnel dust shall be kept under proper control by wet drilling and sprinkling. The tunnel shall be adequately lighted and ventilated. Only electric or air motorized equipment shall be used in the tunnel. An adequate power supply shall be available *511 at all times. All rock projections inside the tunnel neat line shall be removed and overbreak beyond the tunnel pay line shall be backfilled with approved material, compacted to the required density without cost to the Government. Where and as the arch ribs and liner plates are placed to the designated grade and alignment, the over-break voids at the crown and haunches shall be progressively backpacked with selected tunnel excavation in a way that will hold the completed tunnel protection on line and grade. Where such tunnel protection is not required all overbreak beyond the tunnel pay line shall be backfilled with concrete. Such work shall be done together with placing of the concrete tunnel lining. After the concrete tunnel lining is in place and prior to tunnel and collar grouting the entire length of the tunnel shall be grouted at a pressure not to exceed five pounds to complete filling remaining overbreak voids. Such grouting including furnishing and placing of grout pipes will not be paid for as a unit and all costs shall be included in the contract unit price for tunnel concrete lining. Disposal of tunnel excavation shall be in accordance with subparagraph TP3-Old.
b. Blasting. — Blasting procedure shall be in accordance with subparagraph TP3-05 b (3). At the outset and as the work progresses throughout the length of the tunnel, the breaking qualities of the rock structure encountered shall be observed and the spacing, depth, loading and shooting sequence of the holes shall be adjusted accordingly so as to keep to a minimum over-break and shattering of the rock formation outside the tunnel excavation limits. The Contractor shall be responsible for all overbreak and shall replace it with approved material and placing methods without cost to the Government. All blast-loosened rock still in place shall be immediately broken out or working conditions otherwise made safe by the placing of temporary protection.
TP4-03. TUNNEL PROTECTION. — a. Scope.— Tunnel protection shall be furnished and placed as required for distances of approximately the first 50 feet at each end of the tunnel which includes the underground portion of the outlet transition. Such tunnel protection conforming to the cross sectional shape of the tunnel and transition, shall consist of steel arch ribs and corrugated steel liner plates as indicated on the drawings or required, including tie rods and spreaders. Liner plates shall be placed before the setting of ribs. In erecting, each arch rib shall be properly spaced, set *512 to the designated grade and alignment, and in a position normal to the tunnel axis. Each rib shall be connected to each successive one by seven (7) sets of steel tie rods and pine spreaders, uniformly spaced. The Contractor shall submit detail drawings indicating fabrication, splicing of ribs and erection methods of the proposed tunnel protection. No material delivery shall be made prior to receipt of the Contracting Officer’s written approval but such approval shall not relieve the Contractor of his sole responsibility for damage resulting from the inadequacy or lack of such protection. Steel for arch ribs, liner and splice plates, tie rods and other items necessary to tunnel protection shall be commercial products and shapes having the necessary physical and chemical qualities for the intended purpose and shall be fabricated according to the best standard practice. The erection of such tunnel protection shall be carried as close to heading blasting as is feasible without undue damage to tunnel protection in place.
5. Steel Tunnel Protection Supports. — Steel arch rib tunnel protection supports shall be erected in the tunnel sections, where tunnel protection is indicated on the drawings or directed by the Contracting Officer and shall be steel I-beams of the size, weight and length, and bent to the shape indicated on the drawings. The maximum center to center spacing shall be as designated. Suitable dowels shall be provided at the invert to maintain foot of ribs in proper position. Tie rods and spreaders shall be installed at the same time ribs are set. Blocking and other timber required for erection shall be furnished by the Contractor. Arch rib splicing, limited to two for each rib, shall develop the full strength of the rib. Steel ribs shall be left in place and embedded in the concrete tunnel lining.
c. Steel Liner Plates. — Steel liner plates for tunnel protection shall be placed in the tunnel sections, where such protection material is indicated on the drawings or directed, to furnish coverage for the tunnel roof section above the spring line. The ends of plates in adjoining rows shall be staggered and half plates furnished where necessary for this purpose. Liner plates shall be left in place and have concrete tunnel lining placed against their inner surfaces. Liner plates shall be fabricated corrugated steel plates not less than number three (3) gauge, bent to the designated radius and pressed into the required shape consisting of integral side with square corners and elongated holes for con *513 necting bolts, similar and equal to Armco Type 18-incb section.
TP4-04. CONCRETE TUNNEL LINING. — a. Scope. — The entire tunnel bore including the outlet transition shall be lined with concrete which shall conform to the applicable requirements of Section X. No tunnel concrete shall he placed prior to the completion of the entire tv/rmel bore, then its placement shall be exped/itiously prosecuted to completion. * * * [Italics supplied]
* * * * *
TP4-08. PAYMENT. — a. Tum/nel Excavation. — Payment for tunnel excavation will be made at the contract unit price for “Tunnel Excavation — Unclassified,” Item No. 10. No payment will be made for excavation beyond the pay line and all such overbreak shall be filled with suitable material or concrete as required without cost to the Government. The contract unit price shall include all costs of drilling, blasting, excavation, hauling, and disposal as specified in paragraph TP3-01d.
o.- Tu/nnel Protection. — Payment for all costs of furnishing and placing liner plates, and tunnel supports, including tie rods and pipe spreaders, specified herein or directed by the Contracting Officer, will be made at the applicable contract unit price for “Steel Liner Plates,” Item No. 11 and “Steel Tunnel Supports,” Item No. 12. Partial payments will be made according to paragraph TP11-14.
c. Concrete Tum/nel Lining. — Payment for furnishing and placing concrete lining in the tunnel, except the furnishing of cement, will be made at the contract unit price for “Concrete in Tunnel,” Item No. 34. Payment for furnishing cement will be made at the contract unit price for “Cement,” Item No. 36. All costs of concrete or repair grouting required to fill overbreak voids outside the pay line shall be included in the contract unit price for Item No. 34.
d¿ Reinforcing Steel. — Payment for reinforcing steel, placed as shown on the drawings or directed, will be made at the contract unit price for “Steel, Concrete Reinforcement,” Item No. 38. (See subparagraph TP10-22c.)
‡ ‡ ‡ ‡
TP10-01. SCOPE OF TEE WORK. — The work covered by this Section consists of furnishing all material and equipment and performing all labor for the manufacture, transporting, placing, finishing, and curing of *514 concrete in tlie structures included in these specifications.
TP10-22. MEASUREMENT AND PAYMENT. — a. Concrete. * * *
b. Portland Cement. * * *
c. Reinforcement. — (1) Measurement of reinforcement will be made of tbe lengths of bars actually placed in accordance with the drawings or bar schedules approved by the Contracting Officer, or in accordance with the instructions of the Contracting Officer. The measured lengths will be converted to weights for the size of bars listed by the use of the unit weights per lineal foot stated in Federal Specifications Q,Q-B-7la, 1-5. Steel in laps indicated on the drawings or required by the Contracting Officer will be paid for at the contract unit price. No payment will be made for the additional steel in laps which are authorized for the convenience of the Contractor. Furnishing and placing reinforcement bars will be paid for at the contract unit price per pound for Item No. 38, “Steel, Reinforcement.”
7. The Cabot Construction Company, plaintiff’s subcontractor, performed the work of drilling, blasting and mucking in the driving of the tunnel. The Cabot firm was unusually qualified in that kind of work. The work of driving the tunnel was accomplished essentially on schedule, in a workmanlike manner and with dispatch, but not without difficulty.
8. The plaintiff upon receiving the invitation to bid for the contract, made a thorough investigation of the site. The plaintiff’s chief engineer, president and general superintendent visited the site of the Almond Bam and tunnel on or about March 1, 1946. They looked for all open cut rock in the vicinity of the proposed dam on highways and the railroad nearby which might disclose the nature of the rock that would be encountered in the course of construction. To acquaint themselves as to the type of material to be encountered, they examined the area of the dam, the borrow area sites and any test pits in those areas, the site where the railroad and the highway were to be relocated, the site of the stilling basin at the tunnel outlet portal, the site of the tunnel inlet portal and the site of the spillway. The *515 only exposed rock was near the railroad, across the valley from the tunnel and at a higher elevation. They did not find any exposed rock in the area laid out for the Almond Tunnel. They examined the specifications, schedules and drawings relating to the diversion tunnel included in the contract work. They examined the logs of the borings as shown in the contract drawings but did not examine the cores which were available for inspection at the U. S. Engineer Soils Laboratory at Ithaca, New York.
9. The Cabot firm began the driving of the tunnel on December 12,1946. It was engaged prior to that time in open cut excavation of rock adjacent to both the outlet and inlet areas of the tunnel. The existence of mud seams beyond the pay line on vertical slopes at the outlet end near the stilling basin caused considerable overbreak there, and resulted in apprehension on the part of the plaintiff and its subcontractor as to conditions which might be encountered as the tunnel excavation progressed. On December 10, 1946, representatives of both firms went to Baltimore, Maryland to confer with the contracting officer as to these matters. They conferred with Colonel J. S. Seybold, who told them that he would visit the site. He did so on December 12,1946, but did not confer at the site with the plaintiff. The contracting officer (who was also district engineer at Baltimore) conferred at the site of the work with the resident engineer. As a result of the discussions referred to above payment of about $8,000 was authorized and thereafter accomplished near the outlet area of the tunnel, for overbreak due to a vertical mud seam.
10. The crew of workmen who were engaged in driving the tunnel consisted of eleven men and a superintendent on the day shift who were engaged in drilling operations, and five men on the night shift who were engaged in mucking operations, that is, cleaning out and hauling away the rock which had been blasted after the drilling operation.
11. From the beginning of the work on the tunnel, Mr. E. F. Diehl, Vice President and Chief Engineer of Cabot Construction Company and Mr. W. D. Dunham, President of that firm, urged Mr. D. H. Mather, defendant’s [Resident Engineer, to make provisions to have additional steel on *516 the job to prevent delay in the driving of the tunnel. They wei’e advised that the only steel which would be provided would be for the 50 feet at the outlet portal and 50 feet at the inlet portal. Cabot proceeded with tunnel work at the outlet end, erecting the steel arch supports and liner plates for the first 50 feet. The roof of the tunnel for the first 50 feet was badly jointed. There were vertical intersecting seams filled with mud. The steel arch ribs were placed at 4-foot intervals as the drilling operations progressed. The liner plates were placed above the ribs. As the drilling continued beyond the 50 feet at the outlet end, the condition of the roof was about the same for the next 16 feet. The Cabot firm requested and was given permission to install four additional units of the steel arch ribs and 16 additional feet of liner plate at the outlet end. In effect, this steel was borrowed from that which was on hand for use at the inlet end of the tunnel. When it became necessary to remove the borrowed steel for use at the inlet end, approximately 5 cubic yards of rock fell from the roof.
12. The plaintiff wrote the following letter to the resident engineer on December 18,1946, concerning the borrowing of steel for the 16 feet of tunnel mentioned above:
Reference is made to a recent discussion which you had with Mr. Diehl and Mr. Dunham of Cabot Construction Corporation, relative to steel tunnel supports in the tunnel outlet transition.
We have a communication from them stating that they agree to replace steel supports damaged by blasting and rejected for that reason.
We concur with them in this respect and will replace steel supports so damaged at no additional cost to the government.
On December 20, 1946, the resident engineer replied to the above as follows:
The receipt is hereby acknowledged of your letter of 18 December 1946 relative to steel tunnel supports in the tunnel outlet transition.
The agreement made as stated in your letter is satisfactory.
It is thought that the cause of the difference of opinion in this matter was due to a misunderstanding of the use to which Mr. Dunham of the Cabot Construction *517 Corporation, proposed to put the tunnel supports and to clarify the Government's position, the following references to the specifications are made.
a. TP4-02. Tunnel Excavation, a. Scope. — Temporary tunnel protection shall be provided for the safety of the workmen and shall be placed progressively after each heading blast and prior to resumption of excavating and drilling operations.
b. TP4-03. Tv/nnel Protection, a. Scope. — Tunnel protection shall be furnished and placed as required for distances of approximately the first 50 feet at each end of the tunnel which includes the underground portion of the outlet transition. — The erection of such tunnel protection shall be carried as close to heading blasting as is feasible without undue damage to tunnel protection in place.
According to the specifications, the two types of tunnel protection are for different purposes as indicated in the specifications. It was not considered feasible by this office to use. steel tunnel protection as close to the heading as may be required for the protection of the workmen while excavating and drilling without subjecting it to destructive damage, which was the objection to so using it.
If, in the use of steel tunnel protection in lieu of temporary protection, any steel members are damaged which delay the work, no additional time will be allowed for such delays.
13. On January 10,1947, the defendant’s resident engineer sent the following letter to the plaintiff:
This letter will serve to confirm the discussion relative to tunnel protection attended by Mr. Peter Bianchi, President of Carlo Bianchi & Co., Inc., Mr. E. Diehl of the Cabot Construction Co., Tunnel Sub-Contractor, and Messrs. D. A. Losey and D. E. Mather of the Government Inspection Force. This conference was held in the Eesident Engineer’s Office, Thursday aftei’-noon, 9 January 1947.
At this time it was understood and agreed that as stipulated in Par. TP4-03, Tunnel Protection, a. Scope, that the steel tunnel protection as defined in this paragraph, would not be placed beyond the first 50 feet of the outlet end of the tunnel including the transition section, or to approximate station 27+10. That from this station 27+10 to 21+00 approximately, temporary tunnel protection as indicated in Par. TP4-02, Timnel Excavation, a. Scope, is to be used. Mr. E. Diehl’s *518 request to use steel ribs and timber lagging, for this purpose is in accordance with the specifications, and therefore permissible, provided the outside edge of the steel ribs are set so as not to be inside the outside neat line of the concrete tunnel lining, and as much of the timber lagging is removed just prior to concreting as is consistent with safe working conditions. The expense is to be borne by the contractor. The material use for such temporary protection is optional as long as it furnishes adequate protection.
14. Except for the steel arch ribs and liner plates referred to above, the Cabot firm drilled the tunnel with no protection overhead except that which was provided by careful inspection of the roof as the drilling rig entered the tunnel in the morning and left in the afternoon. The roof was examined and rock which seemed loose was removed with scaling bars.
15. The tunnel was “holed through” by March 12, 1941. Cleanup work commenced immediately by the Cabot firm but there were rockfalls after the cleanup crew had removed loose rock from the floor of the tunnel. For the first 200 feet, the cleanup crew returned to remove rock which had fallen after they had performed the cleanup operations but the rockfalls were so extensive that for the remaining 510 feet of tunnel there was only one cleanup without return for further cleanup. The cleanup crew finished its work on March 25,1947.
16. Because of the rockfall experienced during the tunnel driving operations, Mr. Diehl and Mr. Dunham of the Cabot firm requested the defendant’s resident engineer, Mr. Mather, to authorize the installation of steel tunnel supports and liner plates throughout the length of the tunnel. They were told by Mr. Mather that such would not be authorized as a pay item unless there was an indication that the tunnel would cave in.
17. The assistant resident engineer, Mr. Dale Losey, testified that in light of the condition that existed at Almond Tunnel in April or May 1947 with respect to rockfall, it would be necessary to install some protection before it would be possible to line the tunnel with concrete.
18. On April 10,1947, the plaintiff sent the following letter to the defendant’s resident engineer:
*519 The work involved in excavating the tunnel bore on this job has been completed, and it has been driven through.
Permanent tunnel protection in the form of steel Liner Plates and Tunnel Supports has been installed for distances of 50 ft. at each end of the tunnel.
The work of concrete lining the tunnel is scheduled for accomplishment early in the 1947 season.
It is our opinion that, in recognition of the extremely hazardous conditions existing inside this tunnel, immediate consideration should be given to the provision of permanent tunnel protection throughout the entire length of the tunnel.
Our workmen cannot be expected to carry on under these conditions, which would expose them to the ever-present risk of serious injury or even death from falling rock. It can be expected that they will refuse to enter the tunnel unless and until these hazards are eliminated.
We suggest, therefore, that we be given immediate authorization to extend this permanent protection of steel supports and Liner Plates throughout the entire length of the tunnel, with compensation for same being made to us under the applicable Job Items No’s. 11 and 12.
19. The assistant resident engineer on April 15,1947, sent the following reply to the above-quoted letter:
The receipt is hereby acknowledged of your letter dated 10 April 1947 relative to tunnel protection.
My position in regard to your request for extending contract items 11 and 12 (Permanent Tunnel Lining) to protect the tunnel bore between Stas. 21+00 and 27+10.5, which is in addition to 50 feet steel lining including the outlet transition stipulated for each end of the tunnel, is the same as stated in my letter to your company dated 10 January 1947, subject: Temporary Tunnel Protection. That letter confirmed the approval at a conference on 9 January 1947, in which Mr. E. F. Diehl, Vice President of the Cabot Construction Co., proposed the use of steel ribs and timber lagging for temporary protection in accordance with Paragraph TP4-02. Tunnel Excavation, a. Scope. On 14 January 1947 you were advised orally that your tunnel sub-contractor was using for temporary protection upstream from Sta. 27+10.5, steel ribs purchased for Item 12, and you were advised that their use in temporary protection would be approved provided such use was confirmed in *520 writing. This was done in a letter dated 14 January 1947 signed by Mr. T. A. Coyne. _ This is evidence of a clear understanding that the section of the tunnel between Stas. 21+00 and 27+10.5, that temporary tunnel protection for the safety of workmen was to be used in accordance with the applicable specifications.
The fact that your sub-contractor was able to drive the tunnel through the section in question safely without placing such temporary protection does not in any way relieve you of your responsibility for protection of the work and workmen during the operations required for placing the concrete tunnel lining.
In reference to the fifth paragraph of your letter as required by the specifications you are responsible for the safety of all workmen on your contract and shall provide during construction at your own expense adequate safety protection for them and the work involved. Therefore, the further procurement and placing of contract items 11 and 12 are not authorized.
For the Resident Engineer :
20. On April 23,1947, the plaintiff sent the following letter to the resident engineer with a copy to Colonel J. S. Seybold, District Engineer, Baltimore, Maryland:
Re: Permanent Tumnel Protection
We have received a letter dated April 15, 1947, from Mr. Dale A. Losey, Assistant Resident Engineer, in reply to ours of April 10, 1947, on the above subject.
We wish to point out that the request contained in our letter of April 10 does not concern itself with the matter of temporary tunnel protection; it is concerned wholly with the permanent type of tunnel protection as described in the contract specifications paragraph TP4r-03.
The specifications clearly indicate that the Government intended installation of permanent steel supports and liner plates to a distance of 50 feet in from each end of the tunnel and for such additional distance as conditions would require.
Ever since the start of rock excavation work on this project, and even prior to the time when the actual tunnel excavation was started, the question of the character of the rock that would be encountered in the tunnel has been the subject of discussions with the Resident Engineer and his staff. These discussions were participated in by our subcontractor, Cabot Construction Corporation, as well as ourselves. We consistently *521 maintained the position that the character of the rock within the tunnel was such that provisions should be made for permanent tunnel protection. The Resident Engineer took the position that the permanent tunnel protection would be authorized only for 50 feet from each end.
In view of the position taken by the Government, the subcontractor was required to proceed with the excavation of the tunnel without the installation of permanent tunnel protection, employing temporary tunnel protection of its own devising in order to afford the necessary protection for its workmen.
As a result of the failure of the Government to authorize the installation of permanent tunnel protection during the progress of excavation, there have now developed large areas where the tunnel roof has disintegrated or failed, and there are piles of dislocated material on the floor of the tunnel.
In view of the now known facts with reference to the dislodgment or failure of large areas of the tunnel roof, a condition which could have been anticipated and prevented had the Government acceded to our request for permanent tunnel protection, we now again request that the Government authorize the installation of the permanent tunnel protection, together with the necessary and obvious corrective measures incidental thereto, at the Government’s expense.
May we have the courtesy of a prompt reply granting to us the above-requested authorization?
21. The letter of transmittal to Colonel Seybold of the copy referred to above, bearing the same date, is quoted below:
We are enclosing for your consideration and record a copy of a letter which we have today addressed to Mr. D. E. Mather, Resident Engineer. The subject matter involved is of vital importance to the orderly progression of this project. It is not our desire to engage in controversies with the Government, but we feel very strongly that the conditions now existing could have been avoided had we been granted the authority we requested.
22. On May 5, 1941, Colonel Seybold sent the following letter to the plaintiff by registered mail:
Reference is made to your contract number W-30-180-eng.-397, providing for construction of Almond *522 Dam at Almond, New York, and to your letter dated 23 April 1947 inclosing for my consideration your letter of even date addressed to my Resident Engineer requesting an authorization to place at contract prices additional permanent protection in the tunnel.
I have caused an examination to be made of the contract documents and the circumstances and events that have preceded your request and I have found as follows:
a. Contract drawing sheet No. 7 shows foundation exploration data that indicates the type and character of the material that would be encountered during the tunnel driving and lining operation.
b. Paragraph SC-7a of the specifications notified all parties interested in this project that samples of the materials removed from the foundation exploration holes were available for inspection at the XJ. S. Engineer Soils Laboratory at Ithaca, New York.
c. Paragraph GC-3 of the specifications annotated for the information of prospective bidders, certain items of consequence with respect to site and job conditions. Your acceptance of the contract indicates that you have satisfied yourself as to these conditions including subsurface conditions.
d. Contract drawing sheet No. 24 clearly indicates tunnel protection 50 feet back from the face of each portal of the tunnel.
e. Paragraphs TP 4-03 (a) and (c) of the specifications also describes and indicates the limits of tunnel protection “as required for distances of approximately 50 feet at each end of the tunnel.” This limitation to hold unless directed otherwise.
f. Paragraph TP 4r-02 of the specifications contains a statement that “temporary tunnel protection shall be provided where required for safety of the workman.”
Under the terms of the contractual requirements cited above, I consider that the Government clearly and in a very exact manner indicated the extent to which the Government would require and assume payment for permanent tunnel lining. I also consider that sufficient data was available for you to make a proper consideration of the tunnel protection which would be necessary for you to install in order to provide adequate protection against damage to completed work as well as the safety of your workmen.
A review of the records of my Resident Engineer indicates that he consulted with your representative prior to the commencement of the tunnel work and *523 advised you fully and correctly as to the extent of both the Government’s responsibility and your responsibility in placing tunnel lining beyond the limits required and indicated for payment.
Interim correspondence indicates that you were periodically aware of the gradual deterioration of the rock in the tunnel which did not commence until the tunnel was completely holed out, yet you apparently took no action to protect either yourself or the interest of the Government.
It is my decision, in view of the above finding, that no further tunnel lining will be placed at the expense of the Government. Furthermore, my Resident Forces will be instructed to require that adequate precautions be taken to insure the safety of all personnel when your tunnel operations are resumed.
If you wish to appeal my decision in the matter, you are advised of your rights of appeal within 30 days from date of receipt of this letter as provided under the terms of Article 15 of the contract.
23. The plaintiff on May 29, 1947, filed a timely appeal from the contracting officer’s decision.
24. On May 26, 1947, following a conference at Baltimore with Colonel Seybold and his staff, the plaintiff wrote the following letter to the contracting officer:
Reference is made to the letter which we addressed to your Resident Engineer on April 23, 1947, and to your reply dated May 5,1947 (File #NABVK).
On the occasion of our recent conference with you and members of your staff at Baltimore on May 12, we pointed out the importance of proceeding with the installation of the tunnel lining, and therefore requested that the Contracting Officer give us an indication of the type and character of permanent tunnel protection so that we could place orders for the materials. In response to our request the Contracting Officer directed that we submit for approval a description of the tunnel protection which we would recommend.
After careful consideration, and consultation with Cabot Construction Corporation, our subcontractor on the tunnel work, and with our Consulting Engineer, Mr. Miles N. Clair, Yice President, The Thompson & Licht-ner & Co., Inc., Boston, Mass., and with Mr. F. J. Cran-dell of Liberty Mutual Insurance Company, Boston, we are of the opinion that the minimum permanent tunnel protection which we believe will meet the requirements of the situation adequately, and for which we request *524 the approval of the Contracting Officer is the use of the same ribs and liner plates as were used in the installation at the portals, for the entire length of the tunnel.
Due to the fact that this is a situation requiring immediate attention and decision on the part of all concerned, we earnestly suggest that you give the subject your immediate attention and inform us promptly whether or not the above proposed type of tunnel protection is approved.
In tailing these steps to assure progress of the work in the interest of the government, we do not waive any rights related to the appeal we are taking to the ruling contained in your letter of May [5], 1947.
25. On June 13,1947, the contracting officer sent the plaintiff the following letter:
Reference is made to your letter dated 26 May 1947 wherein you submit a proposal for the safe protection of your workmen in the tunnel at Almond Dam under your Contract No. W~30-180-eng-397.
Your request refers to “Permanent Tunnel Protection”. You are advised that no permanent tunnel protection will be required to be installed in Almond Dam Tunnel in addition to that protection already installed and paid for under contract payment items numbers 11 and 12. Also, you are advised that “Permanent Tunnel Protection” required under this contract is at the portals only and is protection designed to withstand earth pressures.
Temporary tunnel protection as required under the provisions of paragraph TP4r-02 of the contract specifications is temporary in that its only function is to support a falling rock load and prevent injury to your workmen. The greatest load to which it will be subjected will be the dead load of the back packed materials.
In paragraph 3 of your letter, you state that you are of the opinion that the minimum permanent tunnel protection .that will meet the requirements of the situation adequately and for which you request approval are the same ribs and liner plates used at the portals. If you desire to use this design of tunnel protection throughout the tunnel length, its use is approved. You are advised, however, that this type of installation is considered as an over design for the purpose required and will be a more costly installation to you than is considered necessary.
It is suggested and recommended to you that adequate temporary protection may be obtained by using I beam *525 ribs of about 3 inches and 6 pound weight spaced 4 to 8 feet apart (depending on the overbreak) with 2" timber lagging. The void area in the arch would then be uniformly packed with shale or bank run gravel in a manner to insure a uniform load distribution. Protection of this kind will be adequate to support the falling rock load as well as the material used in back packing.- Favorable consideration will be given to a proposal of comparable design.
It might be called to your attention that a scheme similar to the above was proposed to my Besident Engineer by a representative of your subcontractor, the Cabot Construction Company, at the time tunnel excavation was commenced.
It is to be understood that the contents of thig letter are not to be construed as a reversal of my decision to you dated 5 May 1947 to the effect that no payment would be made by the Government for the additional tunnel protection required to complete work under your contract.
26. In the meantime, the plaintiff had requested advice from F. J. Crandell, Assistant Vice President of the Liberty Mutual Insurance Company, and Chief Engineer of its Loss Prevention Department. This firm was the plaintiff’s carrier as to workmen’s compensation, liability and property damage insurance. Mr. Crandell was an engineer of over 30 years’ experience whose specialty was roof control in tunnel work. Crandell inspected the tunnel on April 14, 1947 for the purpose of determining the safety of the roof condition in the Almond Tunnel and whether or not the conditions required the timbering of the roof section.' He entered the tunnel from each end and observed the conditions existing for a distance of 200 feet from each end. He did not see the center 300 feet of the tunnel. On April 18, 1947 he sent an eight page report of his findings and conclusions to the plaintiff. The letter of transmittal is quoted below:
Attached, you will find my report regarding the roof conditions in the Diversion Tunnel of the Almond Dam.
In addition to the conclusions drawn from this investigation that are incorporated in the report, I wish to mention at this time that the installation of the braces, in the Diversion Tunnel, that will be necessary will, no doubt, be a dangerous operation.
*526 The length of time that the tunnel has been unsupported has brought the roof into a treacherous condition, and therefore I believe it advisable to study in detail the method that you intend to follow in installing the supports in the tunnel. An actual recording of the step by step procedure that will be necessary, would allow both your organization and ours to study the operation in an endeavor to pre-determine the accident causes that will exist and therefore be able to determine what should be done for the protection of the workmen during this operation.
We would deem it an opportunity to work with your operating personnel in the laying out and analyzing of their design methods for the installation of the braces in order to assure the greatest safety for this dangerous phase of the operation.
Crandell found upon his inspection and examination that the type of rock encountered in the excavation was primarily shale which showed very thin horizontal bedding layers with fractures at an angle to the bedding planes. The interior which he examined showed bedding planes of 2- to 6-inch thickness, while at the portals they were microscopic in size. He also found that there had 'been numerous failures of the roof of the tunnel and that the floor of the tunnel (where he had made his observations) was covered with fallen rock for a depth of 2 to 5 feet. Crandell’s conclusions in his report to the plaintiff are quoted below:

Conclusion:

It is my opinion that the roof of this diversion tunnel is so unstable that if left to itself failure will continue to occur and large voids will eventually show themselves in the roof of the tunnel. These voids, in all probability will take the shape of a triangle whose base will be the width of the existing bore and the two legs will be at an angle of approximately 80° with the horizontal.
Because of the low modulus of elasticity being approximately three million pounds per square inch, this material will deflect ten times as much as steel will, and in the process of this continuous deflection, microscopic fractures will occur that decreases the strength of the shape.
This tunnel is extremely unsafe and no further operations should be performed unless the roof is supported from portal to portal.
*527 The strength of the shale in these thin bedded areas probably averages between two and four hundred pounds per square inch in tension, -and the supports therefore should be approximately four feet center to center.
A large amount of scaling is necessary at the intake portal to insure the safety of further operations. All fault sections and frost heave areas should 'be barred down and continual scaling be performed throughout the operation.
The portal supports on the intake section of the tunnel should be extended at least ten feet outside of the tunnel in order to afford protection against falling rock from the hillside.
During the winter months, due to the low temperatures, this shale contracted. As the temperatures of spring and summertime increase, there will be a large amount of expansion in the rock. This expansion will throw stress into the rock that will produce small fractures and will continually weaken the structure. Because of this expansion medium in the rock, we can look for greater falls than have already occurred, if the condition is allowed to continue without supports.
In order to assure no tremendous dome failures it is important that the rock in this tunnel be supported as soon as possible and thus stop the movement of the rock that is now continuing.
27. Other letters were exchanged between the parties, and on July 25 the plaintiff wrote stating that it had considered the design of tunnel protection recommended by the contracting officer, and called temporary protection by him, and that it had been advised by its consultants, and the Liberty Mutual Insurance Company, that the design was inadequate. The plaintiff then proceeded to outline a design of steel tunnel protection with which it felt that it could safely proceed, being 4-inch steel ribs, 13 pounds per foot, spaced 4 feet apart, with %-inch liner plates above the ribs. Approval of this design was therein requested.
28. On August 11, 1947, the acting district engineer sent the following letter to the plaintiff:
Reference is made to your letters dated 25 July 1947 and 1 August 1947 relative to the temporary tunnel protection which you propose to install under your Contract Number W-30-180-eng-397 which provides *528 for tbe construction of Almond Dam at Almond Dam, New York.
By; letter dated 5 May 1947 you were furnished a decision by Colonel J. S. Seybold, then District Engineer, to tbe effect that tbe tunnel protection remaining under your contract would consist of temporary protection placed in accordance with paragraph TP 4-02 of tbe contract specifications as a safety precaution for the workmen at no additional cost to the Government. You have appealed this decision of the District Engineer in accordance with the terms of the contract. Subsequent to your appeal you had offered for approval a proposed plan of protection, the merits and necessity for which were clearly discussed in a letter to you from the District Engineer dated 13 June 1947.
Your letter dated 25 July 1947 outlines again the plan of protection which you are electing to use. You also express your views with respect to probable differences in cost between your proposed plan and the scheme suggested by this office as adequate. Your letter cites the interests of the Government in the matter as an extra and infers a liability for costs on the part of the Government. It becomes necessary, therefore, to advise you that the decision of the District Engineer and your subsequent appeal will be reviewed and a final decision rendered by higher authority as soon as an orderly processing of your appeal can be accomplished. In the meantime, severe inexcusable delays to the work are resulting from your failure to proceed and it is not believed that your interests will be furthered by continuing correspondence on the matter.
The Government position has been made clear in the previous correspondence and is summarized briefly as follows:
a. In accordance with paragraph TP 4-02 of the contract specifications “temporary tunnel protection shall be provided where required for safety of the workmen”. The installation of this temporary protection is not structurally necessary to insure the safety of the completed tunnel structure and need be designed only to support a falling stone load and backfilled material in the tunnel overbreak area. The design suggested by this office is considered adequate for that purpose and will be approved for use if you wish to reconsider our plan. However, since the safety of your workmen is your responsibility you must, of course, provide a protection which you consider adequate for their safety, therefore, no objection will be made to the protection *529 plan which you propose to use. Under the terms of the contract all costs will be accrued to you unless found otherwise by higher authority.
29- The plaintiff, on August 15, advised the contracting officer, via the resident engineer, that its consultants had recommended to it that-the problem of tunnel protection should be referred to an eminent and nationally known authority for special study and that this had been done, and that such authority had concurred in plaintiff’s view that the district engineer’s recommendation concerning such tunnel protection was inadequate.
30. Mr. Miles N. Clair, a consulting civil engineer with wide experience in tunnel work examined the Almond Tunnel on May 1, 1947. His examination covered the entire tunnel from the inlet portal to the outlet portal downstream. He observed dripping water from the numerous silt or clay joints in the tunnel roof, substantial rockfalls on the floor of the tunnel and that the roof was flat in the areas where rock had fallen leaving triangular shaped areas 3 or 4 feet deep. It was his opinion that these flat roof sections were potential locations for additional falls and that the roof was very unstable. He found that this condition existed on May 1, 1947, also on August 7, 1947, when he again examined the tunnel. He recommended to the plaintiff that it should not proceed with the concrete lining of the tunnel unless supports were installed equal in supporting value to the permanent tunnel protection already installed at the inlet and outlet portals. Mr. Clair advised the plaintiff that the proposed protection suggested by the contracting officer in his letter of June 13, 1947 was not sufficient and would be inadequate.
31. Mr. Leslie F. Worsell, a senior mine and tunnel inspector in the Division of Industrial Safety Service, Bureau of Mines, Tunnels, Quarries and Explosives for the State Labor Department, New York State, inspected the Almond Dam Tunnel on April 25, 1947. He was accompanied on his inspection by Elford H. Richardson, Chief Engineer for the plaintiff and an engineer from the resident engineer’s office. The state inspector examined the tunnel from both ends but due to falling rock was not able to go completely through *530 the tunnel. His reason for not going all the way through the tunnel was due to the danger from the roof falling. As a result of his inspection, he informed the resident engineer that he was going to issue a State Order which would prohibit anyone from entering the tunnel except those who would erect supports to make the tunnel safe. The resident engineer stated to the state inspector that to put steel protection in the tunnel would cost $50,000 and if he authorized this installation he might end up in Leavenworth. The state inspector recommended the installation of steel ribs and wooden lagging or steel linerplates and stated that such installation would be permanent tunnel protection because it could not be removed before concreting and would be embedded in the concrete.
The State Order was directed to the plaintiff on May 5, 1947 and reads as follows:
April 30,1947.
You are hereby directed to comply with the following requirements of Chap. 50, Laws of 1921, as amended.
Tunnel located Almond Dam Project — 3 miles of Hornell, Water diversion Tunnel, County Steuben of • which you are the constructor:
1. Immediately erect and maintain adequate timber or steel to control roof and rib falls of rock in tunnel. Code Bule 1372 — Bulletin 25.
2. Permit no one in the tunnel until this timbering has been done, except men engaged in erection of same.
RECOMMENDATION: Steel ribs supporting either 2" l[a]gging or steel plates.
The above requirements must be complied with IMMEDIATELY, unless otherwise specified herein. Address communications to Bureau of Mines, Tunnels, Quarries and Explosives, State Office Building, Albany, N. Y.
Industrial Commissioner
May 5,1947
32. Subsequent to June 23, 1947, the plaintiff engaged an eminent consulting mining engineer, former Chairman of the Mining Methods Committee of the American Institute of Mining and Metallurgical Engineers, Mr. J. Murray Biddell, to inspect and study the Almond Tunnel and to determine the nature of protection required before concreting. Mr. *531 Eiddell had extensive experience as a mining engineer in connection with underground operations, particularly in rock structure tunnels, and is Professor of the Department of Mining, College of Mining and Technology, Houghton, Michigan. He examined the Almond Tunnel. His findings were as follows: The rock in the tunnel consisted primarily of shale with a very limited amount of thin bedded sandstone. The structure was very nearly horizontal and badly weathered. The mass was fractured by the joint planes. There was some fracturing along the bedding planes horizontally. The joint planes, which were irregular in many instances, were filled with seams of mud or mud coating. Their angle of intersection one to the other varied between 60° and 90°. Water was dripping from the top of the tunnel in a great number of places. The sides of the tunnel were what he termed as weakened. There was evidence of rock failures from the roof. There was no adhesion in the fractures of the rock other than the mud or coating of mud, and this was very poor. There was also water seepage in the fractures from the roof structure and on the sides of the tunnel. Throughout the tunnel there had been failure of the roof, the amount of rockfall varying in different places. He found that the roof of the tunnel in mining terms would be classified as a rotten top and that throughout the tunnel the roof was in an unstable condition. Mr. Eiddell was of the opinion that the Almond Tunnel required permanent tunnel protection before concreting and recommended that the entire tunnel be lined with steel sets.
33. Plaintiff proceeded to install the steel ribs and liner plates throughout the tunnel and completed such installation between mid-August and mid-October, 1947, following which plaintiff proceeded to complete the installation of the backpacking above the linerplates, and the cleanup of the floor of the tunnel in preparation for the concrete work. Following the installation of the ribs and liner plates and the backpacking, it was necessary to do a completely new job of cleaning out the invert of the tunnel. After the cleanup of the tunnel in March 1947, subsequent rockfalls occurred and the work of the machinery such as crawler tractors and trucks and other types of equipment going back *532 and forth through the tunnel and the spillage of material used in backpacking, caused the floor of the tunnel to disintegrate to a certain extent. All of such loose material had to be removed and the invert washed down before the concrete could be placed. Plaintiff, knowing that it would be necessary to concrete during the winter months, was required to and did prepare its concrete batching plant for winter work which required completely enclosing the plants, putting in a couple of steam boilers, piping, making installations to protect the materials before they were incorporated in the concrete, and also making provision to protect the areas after the concrete had been poured. The work described was done between mid-October and December 15. Plaintiff commenced the concreting of the Almond Tunnel on December 15, 1947, and completed it on May 8, 1948.
34. The formation and nature of the rock structure of the Almond Dam Tunnel, the logs of the borings and the drawings, were studied and investigated by numerous witnesses appearing both for the plaintiff and the defendant. They included geologists, consulting engineers and engineering representatives of both plaintiff and defendant. From the testimony of these witnesses it is apparent that vertical intersecting fractures containing mud or clay seams were found throughout the tunnel.
35. The vertical intersecting fractures containing clay or mud seams were the basic cause of the rockfalls throughout the tunnel. The vertical intersecting fractures divided the rock into vertical columns. The bedding planes were planes of weakness, not open fractures, dividing the rock into blocks or slabs. Mud was washed down from above in many of the joint cracks. When the tunnel was holed through the support of the columns of rock was removed and they were supported only by friction along the fractures, and as a result many blocks and slabs fell immediately after the tunnel excavation was completed. The weather reports for the area of the tunnel clearly show that precipitation for the months of March and April 1947 was very substantial, the total precipitation for April being 5.5 inches. This resulted in the ground being saturated and the mud in the fractures being saturated and with water seepage working through *533 the fractures acting as a lubricant, washing the mud seams out, caused many blocks of rock to fall.
The excavating of the tunnel took place during the winter months — December through March, and during this period the ground above the tunnel was frozen and the water was frozen so that the cracks did not loosen up through the mud seams. This accounted for the smallness of the rockfalls during the excavation period. The bad falls took place in the spring. These falls indicated that the tunnel roof was not stable.
36. Another indication of the instability of the Almond Tunnel was its change in excavated shape during the period from the holing through on March 12, 1947, to the time the plaintiff installed steel ribs and liner plates. The rockfalls during this period changed the tunnel shape on the roof, haunches and invert. These changes are apparent from the cross sections of the tunnel taken by the plaintiff’s engineers shortly after the holing through and at later dates before the installation of steel ribs and liner plates, thus affording a comparison of the rockfall over a period from the spring of 1947 until the fall of 1947. These cross sections taken at 10-foot intervals of the tunnel consisting of 13 sheets were examined by the plaintiff’s witnesses and by the defendant’s resident engineer.
The evidence establishes that, as indicated in plaintiff’s exhibit 52, there were many places of flat roof where large slabs of rock had fallen out and that these large blocks of rock having fallen out left an irregular roof with much over-breakage beyond the intended line, and that this condition •existed practically throughout the tunnel. These conditions indicated that the roof was unstable between stations 21+00 and 27+10.
The resident engineer from his examination of plaintiff’s exhibit 52 admitted that the Almond Tunnel had changed its shape from the time of excavation to October 1947. The assistant resident engineer of the defendant admitted from his examination of plaintiff’s exhibit 52 that there was a change in the invert shape at various stations and that at certain stations the rockfalls were substantial, resulting in a change in the perimeter of the tunnel.
*534 37. Another indication of the instability of the roof structure was the fact that it would not corbel and arch well. Normally in a shale formation a rockfall from the roof would have a natural tendency to corbel itself and form an arch. This did not occur however, in the Almond Tunnel where rock fell leaving a flat roof, thus indicating that it would not corbel and arch well. The flat roof sections were potential locations for additional falls.
38. The specifications and the logs of the borings indicate that for the first 50 feet in from the portals it would be expected that weathered rock would be found. Beyond that distance the logs of the borings and the drawings containing the descriptive legends indicate that unweathered rock would be expected to be found in the tunnel interior. The plaintiff’s consulting' engineer, Mr. J. Murray Riddell, had prepared under his supervision plaintiff’s exhibit 116, based upon his investigation and observation of the Almond Tunnel, including the drawings, logs of the borings and specifications. This exhibit is a drawing of the tunnel profile showing the various tunnel drill-holes and whether the rock expected to be found in the area of each tunnel drill-hole was weathered or unweathered based upon the designations in the logs of the borings contained in plaintiff’s exhibit 4r-B.
The distinction between weathered and unweathered shale lies in the difference of the fractures and the presence or non-presence of mud seams in the fractures. Weathered rock has fractures and mud seams whereas unweathered rock may have fractures but joint fractures would be a minor exception and would not contain clay or mud seams.
The specifications prepared by the defendant’s engineers were predicated upon the information contained on the drawings including the drill hole legends of weathered and un-weathered rock. From this information supplied the plaintiff the defendant represented that the plaintiff could expect that rock of an unweathered nature would be found throughout the tunnel beyond the 50 feet at the portals. Drill Holes Nos. 13, 31, 32, 33,57, and 59 indicated unweathered rock in this area. Such rock if unweathered as indicated in the drill holes referred to would be structurally sound and would not *535 contain vertical intersecting fractures containing clay or mud seams such as were found in this tunnel area.
The defendant’s geologist testified that the logs of the cores shown in the drawings at Almond Tunnel were inserted to apprise the contractor as to the sub-surface conditions and admitted that when the logs of the borings show weathered and unweathered rock a contractor should be reasonably entitled to believe that the logs are correct and that un-weathered rock would be found where shown.
39. It is clear from the evidence that the concreting operation in the tunnel could only be accomplished by supporting in some manner the roof of the entire tunnel during the concreting to insure that portions of the roof would not fall into the wet concrete. This was admitted by the defendant’s resident engineer and his assistant.
40. The defendant’s witnesses drew a distinction between temporary and permanent tunnel protection as to the objective to be accomplished. They say that temporary protection is used to protect workmen and it is still regarded by them as temporary though it is embedded forever in concrete. As to permanent protection, it is used only to preserve the shape of the tunnel.
4L Prior to the performance of the work under the contract in suit, the defendant had had The Arkport Dam and Diversion Tunnel constructed at a location about four miles from the Almond Tunnel. The rock in the tunnel at Arkport contained more sandstone which is stronger than the shale at the Almond Dam. The bore was 8 feet in diameter (finished bore after concreting). In the contract for the construction of the Arkport Dam and Diversion Tunnel, the defendant specified that tunnel protection in the form of steel ribs and 2-inch wood lagging would be placed if in the opinion of the contracting officer there was need for such protection. The need at Arkport must have manifested itself and the contracting officer so opined because such tunnel protection was installed throughout that tunnel. Mr. Mather was the defendant’s resident engineer for both the Arkport and Almond jobs but despite the larger bore, poorer rock and shale at Almond, he withheld a recommendation *536 for the installation of steel supports for the center 610 feet of the Almond Tunnel.
42. Plaintiff prepared its bid on the basis that the subsurface conditions in the Almond Tunnel after excavation would be such that the roof of the tunnel would be sufficiently stable to permit plaintiff to concrete-line the tunnel without the necessity of first installing permanent tunnel protection beyond the 50 feet at the portals. The defendant accepted the bid on that basis. The vertical intersecting fractures containing clay or mud seams found in the tunnel and the resulting rockfalls after the holing through of the tunnel, main rig it impossible to concrete-line the tunnel without first installing permanent tunnel protection throughout the tunnel, constituted unknown conditions of an unusual nature differing materially from those which plaintiff was justified in believing did exist and from those ordinarily encountered.
43. The steel ribs installed by the plaintiff in the tunnel beyond the 50 feet at the portals which had to be left in place were embedded in the concrete within the neat line.
44. Plaintiff was ready to start the concrete lining of the tunnel by May 1, 1947 in accordance with its progress schedule and had all necessary plant and equipment available either at the job site or within ready access to the job site. The plaintiff did not have a11 of the equipment on the job site because it was evident from the condition of the tunnel that it would be necessary to install permanent tunnel protection so that plaintiff would not have been able to start concreting by May 1. Plaintiff realized that it would be unable to start any concrete work in the tunnel until after permanent tunnel protection had been erected. Plaintiff knew that effecting delivery of the supports after obtaining approval for their installation and the work of installing them would take several months.
The resident engineer admitted that if the plaintiff had had all of the concreting equipment on the job in April 1947, the plaintiff could not have used it, because the plaintiff could not concrete-line the tunnel without first putting in protection, which he termed temporary.
*537 45. The acting district engineer, on February 10, 1948, transmitted to the Chief of Engineers, XT. S. Army via the Division Engineer, North Atlantic Division at New York, the contracting officer’s findings of fact, the contractor’s appeal, contractor’s comments, and his own comments, which contained a recommendation that the contracting officer’s decision be upheld and that the claim for an extra payment be denied. Following the above recommendation, the acting district engineer (who was acting for the contracting officer) said in his letter of transmittal:
❖ ❖ # iji ❖
7. If the appeal is sustained, the contractor would be entitled to payment fi’om the Appropriation 21x3113 Flood Control, General in the amount of approximately $9,000.00, i. e., if paid similar to payment under items 11 and 12, and would open the possibility for additional claims for overbreak and contingent items throughout the tunnel. This is a continuing contract and funds have not been made available for payment of the instant claim.
•}» h* *i» «5» $
46. On March 17,1948, the Division Engineer by endorsement to the material mentioned in the preceding finding, sent it on to the Chief of Engineers concurring in the recommendation of the District Engineer. His endorsement began “This appeal, involving approximately $9,000.00 * * That figure had been mentioned no where except in the quoted portion of the preceding finding.
47. The Corps of Engineers Claims and Appeal Board on June 17, 1948 held a hearing on the plaintiff’s appeal. Witnesses were heard on behalf of the plaintiff and the Government.
48. On December 14,1948, the plaintiff was notified of the adverse action by the Corps of Engineers Claims and Appeal Board and the Chief of Engineers upon the plaintiff’s appeal.
49. From all the evidence of record, it is found that the failure and refusal of the resident engineer to recommend and of the contracting officer to direct the installation of steel arch ribs and liner plates caused a disruption of the sequences of operations, as well as delay in the perform- *538 anee of the work by tbe plaintiff. It required that concreting operations, which the plaintiff could, and would have performed in warm weather, be accomplished in winter weather with resulting loss of efficiency.
50. The finding as to the extent of such delay is reserved for later determination.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Eule 38 (c).