Per Curiam :
In the court’s opinion of January 14, 1959 (144 Ct. Cl. 500), it was decided that the plaintiff was entitled to an equitable adjustment for the cost of installing permanent supports in the tunnel, and the case was remanded to the Trial Commissioner pursuant to Rule 38(c) to determine the amount.
The Trial Commissioner has now reported that Items 2 through 7, both inclusive, and Item 16 were reasonably related to the cost of installing the tunnel supports and the damages for the delay incident thereto and as a result of the disruption to the balance of the contract work. The court agrees with the Trial Commissioner that the plaintiff is entitled to recover for such items, but the court is of the opinion that the plaintiff is also entitled to recover its profit on the cost of installing the permanent tunnel supports and the work incident thereto, which are Items 3, 4, 5 and 16 listed in finding 5 of the Commissioner’s report.
In the plaintiff’s original bid, which was accepted by defendant, there was included 15 percent profit before overhead, taxes and insurance. Plaintiff is entitled to the same profit on these items. With the addition of this profit, so computed, Items 3, 4, 5 and 16 amount to the following:
Item 3 (Finding 28)_$35,418.81
Item 4 (Finding 32)__ 33,432.39
Item 5 (Finding 34)- 16,115.25
Item 16 (Finding 39) __ 3,243.54
*434 The amount of recovery for Items 2, 6 and 7, as found by the Trial Commissioner and approved by the court, is as follows:
Item 2 (Finding 26)_$8,442.08
Item 6 (Finding 36)_ 37,189.29
Item 7 (Finding 38)_ 15,776.00
Items 2 to 7, both inclusive, and Item 16, as thus amended, amount to $149,617.36, which sum plaintiff is entitled to recover.
Plaintiff is not entitled to recover the additional items claimed in its amended petition filed March 9, 1959, for the reason that the additional items claimed therein have no relation to the cost of the installation of the permanent tunnel supports; nor is the plaintiff foreclosed from recovering on the items allowed above by reason of the execution of the release, this matter having been heretofore determined by the court in its opinion filed on January 14, 1959.
Judgment will be entered for plaintiff and against the defendant in the sum of $149,617.36.
It is so ordered.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff constructed an earthen dam and related works near Hornell, New York, pursuant to contract entered into between it and the United States, through the Army Engineer Corps as a flood control project. The plaintiff was paid about three and one-half million dollars for the work, sustaining a net loss of $327,000.
2. This action was brought to recover “compensation for additional work done and reimbursement for the increased costs occasioned by Government delays and other increased costs * * *” due to the failure on the part of the defendant to authorize permanent tunnel supports and liner plates in the tunnel which had been blasted through rock for a distance of 710 feet.
3. The original petition claimed damages totaling $259,-721.87. This total was made up of the following items claimed:
*435 Schedule oí Plaintiffs Increased Costs
1. Cost of Bemoving Extra Overbreak During Original Tunnel Driving_ $1, 092.75
2. Cost of Bemoving Fallen Bock and Extra Bock to Invert Subsequent to Completion of Tunnel Driving (March 25, 1947)_ 9, 018. 00
3. Permanent Tunnel Supports Installed After March 25, 1947 _ 29,354.51
4. Backpacking Installation_ 24, 979.15
5. Additional Concrete Placed_ 11,200.00
6. Heating Costs — Winter Concrete_ 45, 853.08
7. Loss of Efficiency — Winter Concrete_ 18, 560.00
8. Excess Supervisory, Engineering and Administrative Labor — period 1-16-49 through 6-30-49_ 35,250.01
9. Cost of principal Items of Plant and Equipment used and Maintained on Contract after 1-16-49_ 58,118.25
$233,425. 75
(15% allowance for profit on items 1-8, incl.)_ 26,296.12
$259,721. 87
4. The case proceeded to trial on the issue of liability. On January 14,1959, the court decided that the plaintiff was entitled to recover, with the amount of recovery to be determined pursuant to Rule 38(c). Finding 49 of the court reads as follows:
From all the evidence of record, it is found that the failure and refusal of the resident engineer to recommend and of the contracting officer to direct the installation of steel arch ribs and liner plates caused a disruption of the sequences of operations, as well as delay in the performance of the work by the plaintiff. It required that concreting operations, which the plaintiff could, and would have performed in warm weather, be accomplished in winter weather with resulting loss of efficiency.
5. On March 9, 1959, after leave granted by the court, the plaintiff filed its second amended petition which increased the damages claimed to $680,066.01. This total was made up of the following items:
Schedule of Plaintiff’s Increased Costs
1. _
2. Cost of Bemoving Fallen Bock and Extra Bock in Invert Subsequent to Completion of Tunnel Driving (March 25, 1947)_ $8,442.08
*436 3. Permanent Tunnel Supports Installed After Mareli 25, 1947_ 31,248.69
4. Backpacking Installation- 29,392.12
5. Additional Concrete Placed- 13,697.96
6. Heating Costs — Winter Concrete_ 37,189.29
7. Loss of Efficiency — Winter Concrete_ 15, 776. 00
8. Excess Supervisory, Engineering and Administrative Labor — period 1-16-49 through 6-30-49- 32,367. 87
9. Cost of Principal Items of Plant and Equipment used and Maintained on Contract after 1-16-49- 49,400. 51
10. Stockpiling of Impervious Material From Spillway Excavation, and Later Re-excavating and Placing same in the Closure Section of the Dam Embankment _ 59,261. 80
11. Excess Costs of Maintaining and Operating Earth Handling Equipment in Construction of Dam Embankment _ 249,619.14
12. Excess Costs of Supervisory and Engineering Personnel Employed in Construction of Dam Embankment _ 21,186.13
13. Salary of Assistant Superintendent in Charge of Concrete and Structures May 1,1947 to August 7, 1947 (during which period no concrete was poured) Plus Loss of his Efficiency During the Period August 7, 1947 to October 14, 1947_ 3,116.57
14. Cost of Maintaining Equipment for Concrete Operations, Idle from May 1,1947 to August 7,1947; also Loss of Efficiency of such Equipment During the Period from August 7,1947 to October 14, 1947_ 31,257. 03
15. Loss of Efficiency — Winter Rock Excavation for the Spillway December 5,1947 through April 15,1948— 14, 315. 89
16. Engineering Consultant’s Services re Type of Permanent Tunnel Protection Required Prior to Concrete Lining_ 2, 820.47
$599,091.55
(15% allowance for profit on items 2-9 and 11-16 incl.) _ 80,974.46
$680,066.01
6. After the performance of all the work and the acceptance thereof by the defendant, the 37th and final estimate was prepared by employees of the Corps of Engineers for signature by the appropriate officer of the plaintiff. It showed a balance due plaintiff of $12,236.56. This was re *437 turned, signed by an officer of the plaintiff, together with a release executed on behalf of the plaintiff which provided in pertinent part as follows:
Now, therefore, In consideration of final payment under such contract in the amount stipulated above, the undersigned Contractor hereby releases the United States of America, its officers and agents, from any and all claims and demands whatsoever arising under or by virtue of said contract, except as follows:
The contractor reserves its right to pursue further, through appropriate channels, the subject matter of the various claims presented to the Corps of Engineers Claims and Appeals Board and docketed before that Board as Appeal No. 14. The contractor also reserves the right to pursue its claim for damages arising out of the use or non-use of material from Borrow Area No. 3; and also its claim for anticipated profit by reason of the Government’s action in eliminating from the contract the Biprap originally provided for placement in the Kailroad Protection Embankment.
Executed this 11th day of February, 1950.
Thereafter, on March 9, 1950, a check in the sum of $12,-736.56 was issued by the defendant and paid to the plaintiff. This included a $500 amount which had been withheld on an earlier voucher.
7. On May 5, 1947, the contracting officer had sent to the plaintiff by registered letter his decision as to the installation of tunnel supports in the 610 feet of the tunnel which provided in pertinent part as follows:
It is my decision, in view of the above findings, that no further tunnel lining will be placed at the expense of the Government. Furthermore, my Kesident Forces will be instructed to require that adequate precautions be taken to insure the safety of all personnel when your tunnel operations are resumed.
If you wish to appeal my decision in the matter, you are advised of your rights of appeal within 30 days from date of receipt of this letter as provided under the terms of Article 15 of the contract.
8. The plaintiff on May 29,1947 appealed this decision of the contracting officer by addressing a registered letter to the Secretary of War in the following terms:
*438 In connection with the provisions of Article 15 of our contract with the War Department for the construction of Almond Dam, we herewith appeal from the decision of the District Engineer under date of 5 May 1947, wherein the District Engineer ruled that “no further tunnel lining will be placed at the expense of the Government”.
We respectfully request the opportunity to submit evidence and a brief in support of our appeal at the appropriate time.
Will you kindly acknowledge receipt of this appeal ?
9. The above appeal was docketed with the Corps of Engineers Appeal Board as Eng. C&A Board No. 14. After much documentary information was submitted and a hearing requested, a hearing was held on June 17,1948 by the Board in Washington at which plaintiff was heard by counsel and the testimony of its witnesses. In his opening statement to the Board, Charles A. McCarron, plaintiff’s attorney, stated in pertinent part as follows:
For the purpose of the record, I am Charles A. Mc-Carron, counsel for appellant. Perhaps a brief statement, may it please the Board, of the position of the appellant may be helpful in following the evidence as we propose to present it. In many respects there are no substantial differences between the Government and the contractor on certain of the basic facts that will develop in this case. Mr. Fox has clearly stated the position of the appellant to this extent that the appellant has lined this entire tunnel with steel liner plates and appears before this Board asking in equity and good conscience that it be reimbursed by the Government for the installation of these steel liner plates which the contractor felt were absolutely necessary in order to line this tunnel and complete the tunnel job because of the character of the rock that was encountered in the course of boring this tunnel, rock which could not be determined by the information available on the contract drawings and cores that were taken by the Engineers prior to award of this contract. * * *
10. As may be seen from the cost of performing the work of constructing the Almond Dam, and its related works, it was a large undertaking. It required excavation of material of various kinds or classes from either borrow areas or cuts including rock and placement of such of the material as was *439 suitable therefor into embankment. In round figures in excess of 2 million cubic yards of material were excavated (some of which was unusable and therefore wasted or thrown aside) and about one million six hundred thousand cubic yards of material were placed in embankment.
■11. The contract provides in part as follows:
Aeticle 16. Payments to contractor.
# % ‡ ifc
(d) Upon completion and acceptance of all work required hereunder, the amount due the Contractor under this contract will be paid upon the presentation of a properly executed and duly certified voucher therefor, after the Contractor shall have furnished the Government with a release, if required, of all claims against the Government arising under and by virtue of this contract, other than such claims, if any, as may be specifically excepted by the contractor from the operation of the release in stated amounts to be set forth therein.
$ $ $ ‡ $
12. The specifications provide in part as follows:
$ $ $ $ $
SW-2. Principal Features. The work to be performed includes the following principal features:
(1) Diversion and care of stream during construction.
(2) Construction of approximately 1,300 linear feet of earth dam.
(3) Construction of outlet works, consisting of intake structure and operating house, concrete-lined tunnel, stilling basin, and approach and outlet channels.
(4) Construction of saddle type spillway., consisting of concrete ogee spillway weir, a concrete-lined apron, and approach and outlet channels.
(5) Construction of steel service bridge.
(6) Construction of railroad protection embankment.
(7) Eelocation of railroad except ballast and track work.
(8) Eelocation of highway including embankment, temporary gravel surfacing, guard rail and guide posts.
(9) Construction of gravel-surfaced access road.
(10) Construction of lighting and power system.
(11) Installation of materials and equipment furnished by the Government.
The above general outline of principal features does not in any way limit the responsibility of the Contractor to perform all work and furnish all plant, labor and *440 materials required by the specifications and the plans and drawings referred to therein.
* * * * *
GC-5. Progress Charts, and Requirements for Sunday, Holiday and Night Work. a. The Contractor shall within five days or within such time as determined by the Contracting Officer, after date of commencement of work, prepare and submit to the Contracting Officer for approval a practicable schedule, showing the order in which the Contractor proposes to carry on the work, the date on which he will start the several salient features (including procurement of materials, plant and equipment) and the contemplated dates for completing the same. The schedule shall be in the form of a progress chart of suitable scale to indicate appropriately the percentage of work scheduled for completion at any time. The Contractor shall enter on the chart the actual progress at the end of each week or at such intervals as directed by the Contracting Officer, and shall immediately deliver to the Contracting Officer three copies thereof.
1). The Contractor shall furnish sufficient forces, construction plant and equipment, and shall work such hours, including night shifts, overtime operations and Sunday and holiday work, as may be necessary to insure the prosecution of the work in accordance with the ap-groved progress schedule. If, in the opinion of the ontracting Officer, the Contractor falls behind the progress schedule, the Contractor shall take such steps as may be necessary to improve his progress and the Contracting Officer may require him to increase the number of shifts, and/or overtime operations, days of work and/or the amount of construction plant, all without additional cost to the Government.
o. Failure of the Contractor to comply with the requirements of the Contracting Officer under this provision shall be grounds for determination by the Contracting officer that the Contractor is not prosecuting the work with such diligence as will insure completion within the time specified. Upon such determination the Contracting Officer may terminate the Contractor’s right to proceed with the work, or any separable part thereof, in accordance with the Delays-Damages Article of the contract.
í£ íjí íjí
GC-8. Protection of Material and WorJc. The Contractor shall at all times protect and preserve all materials, supplies and equipment of every description *441 (including property which, may be Government-furnished or owned) and all work performed. All reasonable requests of the Contracting Officer to inclose or specially protect such property shall be complied with. If, as determined by the Contracting Officer, material, equipment, supplies and work performed are not adequately protected by the Contractor such property may be protected by the Government and the cost thereof may be charged to the Contractor or deducted from any payments due to him.
#
Special CONDITIONS
SC-1. Commencement, Prosecution and Comfletion. a. The Contractor will be required to commence work under this contract within 10 calendar days after the date of receipt by him of notice to proceed, to prosecute said work with faithfulness and energy, and to complete the entire work ready for use not later than 900 calendar days after the date of receipt by him of notice to proceed. The time stated for completion shall include final clean-up of the premises.
b. The specified time for completion of the contract will be extended by the amount of time lost due to flooding of the work, when such flooding occurs as a result of the stream rising above and overtopping the upstream cofferdam provided it is built and maintained as specified in Section I of these specifications. No extension of time will be granted for completion of the closure section of the dam embankment which shall be completed during the season in which it is started. (See subparagraph TP6-0M.) No extension of time will be made for flooding of the protected area after the time fixed for completion of the contract plus any authorized extensions thereof or where the flooding of the work is due to fault or negligence of the Contractor, as determined by the Contracting Officer. Time extensions allowed for flooding will be commuted from the day when overtopping occurred to and including the day when unwatering and clean-up operations have been sufficiently completed to permit resumption of work within the protected areas; provided that the work of un-watering and clean-up has been prosecuted in as rapid and diligent a manner as practicable. Any extension of time granted the Contractor due to flooding shall not be a basis of a claim against the Government.
o. In the event that the total amount actually due the Contractor for work performed hereunder exceeds the *442 total estimated amount due under tbe contract as set forth in Article 1 thereof, the time for completion will be extended in the proportion that such excess bears to the total estimated amount due under the contract. Should the total payments hereunder be less than the total estimated amount of the contract, the date of completion as specified in paragraph a above will not be affected.
SC-2. Liquidated Damages. In case of failure on the part of the Contractor to complete the work within the time fixed in the contract or any extensions thereof, the Contractor shall pay the Government as liquidated damages the sum of $250 for each calendar day of delay until the work is completed or accepted.
* ‡ * ‡ *
SC-7. Physical Data.
* ❖ * * *
c. Transportation Facilities. (1) Highways. State Highway No. 36 crosses the dam site and is to be relocated in part under this contract. For protection of highway traffic during construction, see paragraph TP1-03.
(2) Railroads. The Erie Railroad passes the dam site and is to be relocated in part under this contract. The Erie Railroad and the Pittsburgh, Shawmut and Northern Railroad serve Homell, New York. The railroads report sidings at Homell for the accommodation of approximately 190 cars. The Contractor shall investigate the availability of sidings both at the site of the work and elsewhere and shall make all necessary arrangements with the railroads for the delivery of materials and equipment. For the protection of railroad traffic during construction, see paragraph TP1-04.
^5 H* *1»
SC-19. Protection of Existing Structures, Utilities and Worh. a. The Contractor shall protect all existing structures, utilities and work of any kind against damage or interruption of service. Damage or interruption of service resulting from failure to do so shall be repaired or restored promptly by or at the expense of the Contractor.
b. The term “utilities” as used herein shall be construed to include all power, telephone, telegraph, gas, air and water lines existing on the site at the time of commencement of work under the contract. All necessary alterations to existing utilities will be made by their respective owners, except that abandoned utilities *443 shall be removed by the Contractor. The Contractor shall cooperate in maintaining all utilities within the limits of construction operations and shall work in close coordination with the respective owners while required relocations ox their utilities are being made. The Contractor shall request the removal of all utilities in the way of construction operations in writing to the Contracting Officer not less than 30 days prior to the date of desired removal. Where possible, utilities will be removed well in advance of construction operations. If, after the expiration of the 30-day required notice period, utilities to be relocated by their owners cause delays in the contract work, an extension of time for completion of the contract work will be granted equal to the extent of such delay, provided that such extension shall not be a basis of a claim against the Government.
SC-20. Damage to Work. The Contractor shall be responsible for all work until completion and final acceptance thereof. However, if in the judgment of the Contracting Officer, any part of the permanent work, including the upstream cofferdam, performed by the Contractor is damaged by flood, which damage is not due to the clogging of the tunnel or trash beams, or the failure of the Contractor to take reasonable precautions or to exercise sound engineering and construction practices in the conduct of the work, additional payment for the repair of such damaged permanent work as ordered by the Contracting Officer will be made at the applicable contract unit or lump sum prices as fixed and established in the contract, which shall be full compensation therefor. If, in the opinion of the Contracting Officer, there are no contract unit or lump sum prices applicable to a part of such work, an equitable adjustment pursuant to Article 3 Changes of the contract will be made as full compensation for the repairs of that part of the permanent work for which there are no applicable contract unit or lump sum prices. Except as herein provided, damage to all work, (including temporary construction) utilities, materials, equipment and plant shall be repaired to the satisfaction of the Contracting Officer at the Contractor’s expense, regardless of the cause of such damage.
‡ ‡ ‡ ‡
SC-23. Work Areas, a. The grounds, easements, rights-of-way and other rights necessary in the opinion of the Contracting Officer for the work under this contract, including those needed for access roads, borrow pits and spoil banks, will be furnished by the State of *444 New York through the Department of Public Works, and will be made available for the Contractor’s use. The Government will not be responsible for any delay in furnishing the grounds, rights-of-way, easements, etc., but in case the furnishing of necessary rights-of-way causes delay in prosecution of the work of the Contractor, the Contracting Officer will grant an extension of time for the completion of the work equal to the time of such delay. It is expressly understood and agreed that such time extension shall not be the basis of a claim against the Government.
‡ ‡ $
SC-24. Unwatering Work Areas. Unless otherwise specifically authorized, all permanent structures shall be constructed “in the dry.” For this purpose the Contractor shall provide such cofferdams, diversion channels, drains (including drain tile and French drains), flumes or other temporary structures, and such pumps and other equipment as may be necessary for unwatermg foundations and work areas not included within the scope of care and diversion of stream as specified in Section 1 of Part IY of these specifications. Such structures shall be subject to the approval of the Contracting Officer, but such approval will not relieve the Contractor ox responsibility for the adequacy of the work. Upon completion of the work all such temporary structures shall be removed from the site. Under drains shall be plugged with concrete after serving the purpose for which intended. Separate payment will not be made for pumping, providing and removing any temporary protective works and equipment specified above, and plugging un-derdrains, but the cost thereof shall be included in the contract unit prices for the various items of the permanent work.
% % # * ❖
SC-27. Cooperation With Other Agencies. While work under this contract is in progress, construction of the permanent highway paving and new highway bridge and the relocation of the railroad track work will be carried on at the site by other agencies. All agencies engaged simultaneously on work at the site shall have equal rights to the use of such work and access areas as may be necessary for the conduct of their respective operations. The Contractor shall conduct his operations so as not to unduly interfere with the operations of others working at the site. The Contractor will not be required to maintain the permanent highway paving, the new highway bridge or the railroad track work as such *445 maintenance will be the responsibility of other agencies.
SC-28. Final Examination and Acceptance. As soon as practicable after the completion of the entire work or any divisible part thereof as may be designated in these specifications, a thorough examination thereof will be made by the Contracting Officer at the site of the work. If such work is found to comply fully with the requirements of the contract, it will be accepted, and final payment thereof will be made in accordance with Article 16 of the contract.
SECTION I. DIVERSION OE STREAM AND PROTECTION OE Traeeic
TP1-01. General. Work under this section shall consist of the care and diversion of the stream and the protection of highway and railroad traffic. The Contractor shall furnish all equipment, materials, and labor required to accomplish the above work, all as indicated on the drawings, specified herein, or directed by the Contracting Officer.
TP1-02. Care and Diversion of Stream During Construction. a. General. At all times prior to permanent diversion through the tunnel the Contractor shall maintain an unobstructed channel 150 feet wide, at valley floor elevation, between the end of the embankment slope and the opposite abutment. He shall be responsible for the safety of the work, and additional time other than that provided for in paragraph SC-1 will not be allowed for delays resulting from failure on the part of the Contractor to provide the necessary protection.
b. Order of work. Temporary and permanent diversion and control of the stream shall be accomplished as indicated on the drawings. Temporary protection shall be provided during construction of the outlet works. All other temporary protective works and temporary diversion shall be completed prior to diversion of highway traffic. Permanent diversion through the oxitlet works shall be made only upon written instructions from the Contracting Officer (see subparagraph TP6-OlcZ) and when the following minimum items of work have been completed.
(1) Outlet works to elevation 1265, including the tunnel, approach and outlet channels complete, and all riprap around the intake structure.
(2) The railroad relocation and protection and highway relocation complete, the dam south of the existing highway to elevation 1320, and remainder of the dam *446 embankment, except the closure section, to elevation 1300.
(3) All other pertinent work that may be directed by the Contracting Officer. By the time the closure section has been completed to elevation 1300, the spillway approach channel excavation shall be completed to elevation 1294 and the remainder of the spillway excavation shall be completed. All concrete in the spillway, except monoliths 4 to 11 inclusive of the weir, shall be completed by the time the closure section of the dam embankment has been constructed to elevation 1310. Monoliths 4 to 11 inclusive of the weir shall not be constructed above elevation 1294 until the closure section of the embankment has been constructed to elevation 1310. All other work shall be completed during the season in which the embankment closure section is completed.
c. Temporary Diversion. (1) Stream Channel. The relocated channel for temporary diversion of the stream shall be constructed to the lines, grades, and cross sections as shown on the drawings. Materials from this excavation shall be temporarily stock piled in the protection levee as specified in subparagraph (2) below and later removed and disposed of as directed.
(2) Temporary Protective Worles. A temporary protection levee shall be constructed upstream from the main embankment as indicated on Sheet No. 16 of the drawings. Final location and extent of this levee shall be submitted by the Contractor for approval of the Contracting Officer. The protection levee shall be constructed of channel excavation materials and will require no special compaction. The Contractor shall provide for the protection of the outlet works effective to elevation 1245 upstream and 1230 downstream by leaving unexcavated such portions of the approach and outlet channels as will provide the necessary protection or otherwise protect the outlet works. If access openings are made in the protective works, the Contractor shall have on the site sufficient sandbags to close the openings. The Contractor shall be fully responsible for the adequacy of the protective works except as provided in subparagraph SC-20, and any damage resulting from failure of such works shall be repaired or replaced at the Contractor’s expense. Clearances between the protective works and permanent structures shall be sufficient to permit unwatering and provide sufficient working area to accomplish the construction work. At the time of permanent diversion the protective works shall be *447 removed in accordance with, subparagraph TPl-02ii following,
d. Permanent Diversion, (1) General. When the items of work specified in subparagraph TP1-02& have been completed and upon written instructions from the Contracting Officer, the Contractor shall make permanent diversion of the stream.
(2) Procedure, (a) Removal of Temporary Protective Woríes. The temporary protective works shall be removed to the lines and grades as shown on the drawings or as directed by the Contracting Officer. Suitable materials from the temporary protective works shall be used in the permanent structures. All other materials shall be disposed of as directed.
(b) Upstream Cofferdam. After filling with waste materials the temporary diversion channel downstream from its junction with the approach channel to the outlet works and constructing the permanent blanket on the end of the dam embankment as specified below, the Contractor shall construct the upstream cofferdam to elevation 1265 at the location and to the lines and grades shown on Sheet No. 16 of the drawings. It shall be constructed of select pervious material, placed and compacted in accordance with the applicable provisions of paragraph TP6-02, and covered on the upstream face with a temporary blanket 5 feet in thickness consisting of sand and impervious materials as indicated on the drawings. Prior to construction of the cofferdam, the Contractor shall construct a permanent blanket on the end of the dam embankment, extending from the impervious section to the upstream face of the dam and up to elevation 1265. The permanent blanket shall be similar to the temporary cofferdam blanket specified above, with the impervious material placed adjacent to the embankment. This permanent blanket and the upstream cofferdam will remain as part of the permanent structure. The temporary cofferdam blanket shall be removed in accordance with subparagraph TPl-02e.
e. Removal of Cofferdam Blanket. After the embankment closure section has been completed above elevation 1265, the Contractor shall remove the temporary cofferdam blanket above the elevation of the adjacent spoil berm to the slope lines of the upstream cofferdam. The material removed shall be disposed of in the embankment or as otherwise directed. Select pervious materials excavated from within the finished slope lines shall be replaced with approved materials at the Contractor’s expense.
*448 TPl-03. Protection of Highway Traffic, a. Highway 36. Tlie Contractor shall maintain and protect two-way traffic on the existing highway through the work area until the completion of the highway relocation and com-
Eletion of the new Canacadea Creek bridge which will e constructed under a separate contract. When specifically authorized by the Contracting Officer, the Contractor shall construct the temporary detour at the east end of the highway relocation, close the existing highway, and direct traffic over the relocation. All measures for the protection and diversion of traffic, including the provision of watchmen and flagmen, erection of barricades, placing of lights around and in front of the work, and the erection and maintenance of adequate warning, danger, and direction signs, shall be as required by the New York State Department of Public Works, Division of Highways.
ifc ifi :J:
TP1-04. Protection of Railroad Traffic. The Contractor shall notify the Contracting Officer not less than 15 days in advance of the date he desires to enter railroad property so that due notice may be given the owners. Upon approval by the Contracting Officer, the Contractor shall proceed with the work and continue without interruption, completing it in the shortest time possible. Work on and adjacent to railroad property shall' be performed with extreme care and in such a manner that there will be no interruption of rail traffic. The Contractor shall furnish necessary flagmen and comply with all requirements of the railroad relative to his operations. In planning and prosecuting construction operations on railroad property, the Contractor shall work in close cooperation with the railroad, and shall submit details of his proposed method of operation for the approval of the railroad. On all work adjacent to the railroad the Contractor will be required to provide such temporary proctection as may be deemed necessary by the railroad. The Contractor shall make arrangements with the railroad to pay all necessary costs of temporary protection including such costs as the expense of flagmen provided by the railroad.
* * * * *
TP3 — 04. Borrow Excmation.
❖ * * ❖ *
5. Excavation Procedure. (1) General. The Contracting Officer will control the execution of borrow excavation. He will direct the locations at which exea- *449 vation shall be made, the depth of cuts and lifts, and the disposition of the excavated material in the several sections of the embankment. The Contractor will.be required to change the location and depth of excavating operations whenever such change is necessary to obtain the proper quality of materials for the part of the embankment under construction. Excavation of materials for use in the construction of the embankment shall be conducted so as to segregate or to secure the desired mixtures of materials for the different classes of materials designated for use in the various parts of the work. Excavation shall be performed so that the materials for the full depth of lift are mixed in the process of excavation. The term “lift” as used herein means the full workable depth of the material which is as a whole suitable for one class of embankment material or which must be wasted. Stripping of the borrow areas shall consist of the excavation of the surface lift and shall be performed only in such areas and to such depths as may be directed. Borrow excavation shall include the clearing and grubbing of the designated areas actually worked, clearing of stockpile and spoil areas, maintaining satisfactory drainage, and the disposal of objectionable materials in designated spoil areas. Necessary clearing and grubbing operations may be prosecuted as the materials are being excavated provided the objectionable materials are separated from the suitable materials.
sí* H» »I»
SeotioN VI. Embankment
TP6-01. General, a. Definition. The term embankment as used in these specifications is defined as the earth and rock fill portions of the dam, the railroad relocation and protection, the access road, the highway relocation and the levee at Borrow Area 3. For dumped riprap and rock in downstream toe trench see Section VIII.
b. Glassification of Materials. Embankment materials are classified according to type, location, and method of placing as follows :

Type Location Placing

Impervious Core section of dam and railroad protection and the upstream cofferdam blanket. 6” layers — compacted

*450
Type Location Placing

Transition Between impervious and select pervious sections of the dam and railroad protection below Station 130+00. 6" layers — compacted
Random Highway relocation downstream from approximate Station 115+00, access road and temporary detours at each end of the highway relocation. 24" layers — uncompacted
Random Between impervious and previous sections of the dam, in the levee at Borrow Area 3 and in the railroad relocation. 12" layers — compacted
Random Highway relocation between approximate Station 115+00 and Station 133+00 and upstream from Station 146+00. 8" layers — compacted
Select Pervious Shell section on the reservoir side of the dam and railroad protection below Station 136+75, and highway relocation between Stations 136+75 and 146+00. 12" layers — compacted
Pervious Downstream section of the dam and railroad jirotection below Station 130+00. 12" layers — compacted
Pervious Central section of the highway relocation between Stations 136+75 and 146+00. 8" layers — compacted.
c. Scope of Work. The Contractor shall spread and consolidate the materials required for the embankments to the elevations, lines, grades and cross sections indicated on the drawings or as established by the Contracting Officer.
d. Order of Work. The Contractor shall' construct the embankment in sections as indicated on the drawings and as specified below (see also subparagraph TP1-025);
(1) The embankment for the railroad protection, the highway relocation and the dam embankment on the south side of the existing highway, within the limits *451 shown on the drawings, shall be completed to top elevation prior to diversion of highway traffic.
(2) The dam embankment between the section specified m (1) above and the closure section shall be completed to elevation 1300 prior to permament diversion and construction of the closure section. In lieu of stockpiling excess embankment materials, the Contractor may place such materials between the existing highway and the closure section prior to diversion of highway traffic as directed or approved by the Contracting Officer.
(3) After permanent diversion, the closure section of the dam embankment shall be constructed to elevation 1300. The closure section and the section specified in subparagraph (2) above shall then be constructed to elevation 1320 in such a manner as to permit construction of the entire length of uncompleted embankment in one operation. During such construction the portion of embankment adjacent to the left abutment shall be kept approximately 2 feet lower than the remainder of the embankment by sloping the embankment along the axis of the dam as shown on the drawings or as directed by the Contracting Officer. The embankment shall be completed during the second working season. The Contractor will be required to show to the satisfaction of the Contracting Officer that there is sufficient equipment on the work to complete the closure section and all other portions of the dam embankment to elevation 1320 during the second working season before authority will be given to make permanent diversion.
e. Source of Materials. Materials for embankment shall be obtained from required excavations and borrow areas as directed by the Contracting Officer. In general it is anticipated that the sources of embankment materials will be in accordance with the provisions of sub-paragraph TP3-01S, but the right is reserved to obtain such materials from any source and in any quantity as may be desired. The disposition of the materials from any source will be determined according to the suitability and classification of the materials. Materials from three origins may be required to be used at the same time in the same part of the embankment, or materials from any one source may be required to be used in different parts of the work.
TP6-02. Embankment Construction.
* * * * #
*452 o. Placing and Spreading of Materials. Embankment material shall be deposited in areas of the embankment as directed or approved by the Contracting Officer. The excavation and embankment placing operations shall be combined as directed by the Contracting Officer so that the material when compacted will be blended sufficiently to secure the best practicable degree of compaction and stability. In general, impervious fill material will be used for the core trench, inspection trench, and the central part of the embankment grading to more pervious material on the outer slopes. The distribution and gradation of materials shall be such that the embankment will be free from lenses, pockets, streaks, or layers of material differing substantially in texture or gradation from the surrounding materials. When two or more classes of materials are being placed in a section of the embankment they shall be systematically spotted, dumped, and bulldozed so that in any area of the section there are approximately the correct proportions of the required materials. After dumping the materials in the embankment the various classifications of embankment materials shall be bulldozed or otherwise spread in layers of the applicable thickness specified in sub-paragraph TP6-01&. During the dumping and spreading operations the Contractor shall remove all brush, roots, sod, and other unsuitable materials as determined by the Contracting Officer, and dispose of them in accordance with subparagraph TP2-01a. Stones having a thickness greater than the permissible thickness of the spread layer or a surface area which would cause interference with the compaction of the embankment material, if suitable for dumped riprap or rock in the downstream toe trench shall be placed in those sections of the permanent work and if unsuitable for the above uses, shall be broken up and scattered in the embankment to the satisfaction of the Contracting Officer or wasted as directed. No embankment material shall be placed on or against frozen surfaces nor shall frozen materials be placed in the embankment. When specifically directed by the Contracting Officer, the Contractor shall stock pile frozen materials for later use in the embankment. The use of shale will not be permitted in any of the permanent embankments, except that embankments for the highway relocation downstream from approximate Station 115+00, the access road, and the temporary detour at each end of the highway relocation, shall be constructed predominately of shale and other waste rock Avith a binder of spoil common ma *453 terials. Nesting of rocks will not be permitted and the amount of binder shall be sufficient to fill all voids between the rocks. In the said highway relocation and access road embankments, stones larger than 2 cubic feet in volume shall not project within 2 feet of the fine grade and large stones shall not project within 6 inches of the side slope lines.
e. Moisture Oontrol. The embankment materials, before rolling, shall have the proper water content required for compaction as determined by the Contracting Officer. The Contractor may be required to wet the surface of the preceding compacted layer, the dumped material before spreading, or the spread un-compacted layer before rolling. Harrowing or mixing the spread material may be required whenever necessary, m the opinion of the Contracting Officer, to secure a uniform moisture content. The moisture content shall be so regulated as to obtain the amount essential to required compaction. Should the material be too wet to permit proper compaction by rolling, the rolling and work on all portions of the embankment thus affected shall be delayed until the material has dried to the required consistency. If additional moisture is required, it shall be added by any means proposed by the Contractor and approved by the Contracting Officer.
# % # % ❖
13. The Almond Dam, as constructed, is an earthen flood control dam having three principal features common to such dams, (1) a main dam consisting of an embankment constructed of compacted earthen materials; (2) an outlet works for control of the reservoir, and (3) a spillway constructed at an elevation lower than the dam, to drain off excess water in the event of flood conditions.
The main dam is constructed to elevation 1320 feet. Connected to it and extending upstream on the right abutment[1] is a supplemental extension or “arm” for the protection of a relocated railroad and a state highway formerly located within the dam site which were contained, in part, in cut below the top elevation of the dam. Paralleling the axis of the dam a core trench, the purpose of which was to prevent seepage of water under the embankment, was excavated to below the dam foundation extending from abutment to abutment. *454 The core trench was filled with impervious material and compacted to the elevation of the foundation. The embankment was then constructed on top of the core trench. Necessarily, the core trench had to be completed before the placement of materials to any extent could proceed in the area of the foundation immediately above the trench.
The outlet works, constructed in the left abutment of the dam, is composed of three principal features, (1) a concrete intake and operating house which contains the gates and machinery for controlling the flow through the outlet works; (2) a horseshoe-shaped concrete lined tunnel 710 feet in length, drilled through the rock of the left abutment; (3) a downstream stilling basin from which the flow through the tunnel returns to the natural stream bed below the dam. At the time of permanent diversion of the creek during the construction period a permanent approach channel was excavated in the reservoir area above the dam to direct the normal water flow into the outlet works.
The spillway was excavated in open cut into rock in a saddle to the left of the outlet works, the intake thereto being excavated in rock down to elevation 1,294 feet. Immediately adjacent to and downstream of the intake is a concrete weir constructed across the spillway at crest elevation 1,300 feet, 20 feet lower than the crest elevation of the dam. The only purpose of the spillway is to serve as a “safety valve” to protect the dam from washout in the event of unusual flood conditions.
14. In the course of construction there were certain features in the sequence of operations peculiar to Almond Dam which are pertinent to the consideration of damages in this case:
(a) To construct the dam embankment it was necessary to relocate a branch line of the Erie Eailroad passing along the intended site of the right abutment of the dam. Under the contract the plaintiff was required to excavate for and prepare a new subgrade for the railroad by cutting back into the right abutment. The actual work of track relocation was performed under a separate agreement between the Government and the railroad.
*455 (b) New York State Highway No. 36 passed through the valley generally parallel to Canacadea Creek and bisected the location of the proposed darn, approximately at its center. Under its contract plaintiff was required to relocate and construct a new highway in the right abutment of the dam in close proximity to the relocated railroad. The site of the new highway relocation occupied, in part, the old bed of the relocated railroad tracks. The final surfacing of the new highway and the construction of a new bridge across Canacadea Creek were performed under a separate agreement between the United States and the State of New York after plaintiff had completed its highway work. It was a requirement of plaintiff’s contract that traffic over existing Highway 36 be maintained until the new highway was completed and opened to traffic.
A telegraph line along the old railroad bed had to be relocated by others along the relocated railroad bed. A telegraph line and an 8-inch gas main along old Highway 36 also had to be removed by others.
,15. In accordance with the plans and specifications as set forth in finding 12, the various portions of the dam relating to the instant claim for damages were required to be constructed in the following order:
(1) A new subgrade for the existing railroad line was to be excavated by cutting back into the right abutment.
(2) Simultaneously with the construction of the new railroad cut, the dam embankment south of existing Highway 36 was to be built up to elevation 1320.
(3) The roadbed for the relocation of State Highway No. 36, part of which was located on the site of the old railroad line, was then to be constructed.
(4) Immediately upon completion of the new highway, traffic was to be diverted thereon and old Highway 36 closed.
(5) It was then required that Canacadea Creek be temporarily diverted in order to permit cleaning out of the upstream bed within the foundation area of the dam.
(6) Having diverted the traffic and temporarily diverted the stream it was then required that the dam embankment north of and including the old highway to the point of closure, be built up to elevation 130Q except for the closure section,
*456 (7) The creek was then to be permanently diverted through the completed diversion tunnel at which point work could commence in the closure section of the dam.
(8) The permanent cofferdam upstream of the closure section of the dam was then to be built up to elevation 1265.
(9) The closure section itself was then to be built up to elevation 1300.
(10) Concurrently with the building up of the closure section to elevation 1300 the spillway approach channel was to be excavated down to elevation 1294. The reason for the requirement that these two operations be concurrent was to provide for a minimum hazard during this phase of construction. By keeping the spillway elevation below the embankment elevation as required a place was provided in the nature of a safety valve, where flood water would drain off before reaching the main embankment. As a further safety factor, it was required that the level of the closure section be kept two feet below the level of the main embankment until completion thereof.
16. The specific sequence of operations for the construction of the dam as set out in finding 15 were so coordinated for a definite purpose. Primarily the prerequisites to stream diversion were set out so as to minimize the effect of possible heavy flood conditions occurring during construction and to prevent destruction of the partially completed dam, with the resultant risk to life and damage to property which could occur in areas downstream of the work.
Secondly, the required sequence of operations provided partial insurance to the Government and to the contractor from financial loss had a flood occurred during construction which could top that much of the embankment constructed to date and result in a washout of the entire dam.
The outlet works was not designed to carry off the flow of the stream during periods of flood. High waters in the Canacadea Creek watershed could be expected normally in the spring and fall months. However, the hydrographs which are a part of the contract plans, show that peak flood conditions could be expected during other seasons of the year. The highest flood condition recorded was during the month of July 1935 when the run-off was 22,000 cubic feet per second, This was about four times as great a volume as oc *457 curred during any other period of flooding during the period 1925-1941. It was to protect against such an unhoped for contingency that a heavy flood might occur during the period of construction which caused the Government engineers who designed the dam, and those who prepared the specifications, to spell out the phases of construction which would be required before the stream could be diverted. In periods when there had been no heavy rains in the upstream watersheds, the stream was very small but there were two or three instances during construction when high water interfered with the work. It can be seen then why it was so important that the work of the railroad relocation and highway relocation, and the embankment along them, plus placement of embankment of more than half of the main dam, were required before the stream could be permanently diverted through the tunnel.
17. The plaintiff’s witnesses have testified that if the plaintiff had not been delayed by the Government in connection with tunnel supports, it could have diverted the stream through the tunnel about a year earlier than it did so and that it could have finished all remaining embankment in the 1947 work season. This testimony is not convincing for three reasons. First, this would have required a major change in the specifications as to how much work should be finished before permanent stream diversion with the chance of great damage to embankment operations in event of heavy flooding as the tunnel was only designed to carry a flow of 4,000 cubic feet per second with the water at an elevation of 1,265 feet. The finished dam was at 1,'320 feet elevation with the crest of the spillway having an elevation of 1,300 feet. Secondly, there was State Highway 36 crossing the main dam area about in the center and it would have been necessary to depart from the specification as to the movement of highway traffic during construction. It is true that this traffic was detoured around the work area from May to September of 1948, but if the stream had been diverted in 1947, it would have made this detour extend for a period of about a year and one half, instead of from May 1948 to September 1948. In this connection very great concern was indicated by the state and county road authorities because Highway 36 carried 5,000 vehicles over a 12-hour period *458 each day, 1,000 of which were tracks; and these vehicles, during tlie detour, had to pass over a railroad grade crossing. Thirdly, the volume of excavation and actual placement of embankment, as indicated in the plaintiff’s payment estimates, clearly shows that it would not have completed all embankment in the 1947 work season.
18. Although it was important to the progress of the work from an overall standpoint to coordinate construction of the dam embankment and the spillway excavation with construction of the outlet works, which included construction of the diversion tunnel, so as not to delay diversion of the stream, the progress of construction of the dam and spillway could have proceeded to a considerable extent independently of, and without interference by, outlet works construction. The outlet works were physically outside the area of dam embankment and spillway operations. The equipment used in outlet works construction consisted of the concrete plant and related items, whereas dam and spillway construction, prior to diversion, employed earth-moving and compacting equipment such as scrapers, shovels, trucks, sheepsfoot rollers, bulldozers, etc.
As hereinbefore shown, in accordance with the plans and specifications, before stream diversion could be accomplished, the contractor was required to be at a stage of construction, where the railroad had been relocated, the highway, in part, relocated on the site of the old railroad bed and traffic diverted thereon, the embankment south of old State Highway 86 built up to elevation 1320, and the embankment north thereof built up to elevation 1300 up to the closure section. The outlet works, therefore, need not have been ready for stream diversion until the aforementioned steps, with respect to the progress of construction of the main embankment, had been reached.
Dam embankment construction on the other hand was related to spillway excavation in that all suitable common materials excavated in the spillway were required to be utilized for placement in the dam embankment.
,19. At the commencement of the work, in August 1946, plaintiff submitted a progress schedule of work operations *459 as required by the contract. Pertinent features of the work were scheduled thereon as follows:
Schedule 3 — Stripping and common excavation: completion
a. Railroad subgrade-May 31,1947
c. Spillway_ Nov. 15, 1947
4 — Rock excavation:
a. Railroad subgrade_June 30,1947
c. Spillway_June 30, 1948
5 — Tunnel:
b. Concreting_Aug. 31,1947
7 — Embankment_Nov. 15,1948
9 — Concrete:
b. Intake and Stilling Basin_Nov. 15,1947
Highway No. 36 closed_Apr. 30, 1948
Permanent stream diversion_Aug. 15,1948
Job as a whole_Jan. 15, 1949
The progress schedule made no reference to the time of temporary stream diversion provided for under the contract. At no time during construction did the plaintiff, by writing or otherwise, indicate to defendant’s agents that it intended to divert the stream through the completed tunnel earlier than August 15,1948.
20. During the course of construction several key delays affected the time when the dam embankment was finally built up to the point where stream diversion was permitted under the contract.
The plaintiff was dilatory in completing the railroad relocation and subgrade which were scheduled for completion on June 30,1947. This was not substantially completed until October 9, 1947, at which time, because of the possibility of freezing conditions that late in the year, the Erie Railroad officials refused to relocate its tracks. This work was not completed by the railroad until October 1948.
The delay in railroad relocation in turn delayed relocation of State Highway 36, part of which was to be on the old railroad bed. The highway relocation scheduled for April 30, 1948 was not completed and opened to traffic until October 13,1948.
Until Highway 36 was relocated plaintiff could perform dam embankment operations north of old Highway 36 to a limited extent only. Construction operations in that area were restricted by the specification requirements that State *460 Highway 36, which bisected the dam foundation, remain open to traffic, and that closure section, 150 feet in width at the bottom, in the bed of Canacadea Creek, remain open until such time as diversion of the creek could be accomplished.
South of Highway 36 embankment operations proceeded in the summer and fall of 1947. However, during the spring and early summer of 1947 very little embankment placement was performed due to poor weather conditions. Plaintiff later received an extension of time therefor.
21. Realizing that its failure to timely relocate the state highway would result in delay of further embankment operations plaintiff, in the spring of 1948, took action to break this bottleneck.
By agreement with the Superintendent of Highways, Steuben County, New York, which agreement was approved by the contracting officer and the New York State Department of Public Works, plaintiff was permitted to detour the traffic from existing Highway 36 via an alternate route over a county road known as Webb’s Crossing Road. The detour was made effective May 28,1948. Following the elimination of highway traffic through the dam site, embankment operations proceeded expeditiously.
In the meantime concreting of the tunnel had been completed by May 8, 1948 and sufficient concrete work had also been completed on the intake works, operating house and stilling basin so that by August 14, 1948, when the embankment had been sufficiently built up to the required elevation, the stream was diverted through the outlet works. Construction of the closure section of the dam commenced immediately thereafter.
Permanent diversion of the stream was thus accomplished almost to the day anticipated by the plaintiff on its original progress schedule. (See finding 19.)
22. It is clear that the work of concreting in the tunnel and also in the inlet works and outlet works was seriously disrupted by the failure to authorize the installation of tunnel supports earlier than the letter of authorization dated August 11, 1947 which was received by the plaintiff about August 14, 1947. The plaintiff in the exercise of sound judgment had engaged the services of numerous independent *461 qualified engineers for consultation as to what might be required in the way of support for the tunnel. It acted on the advice of such engineers, and about three weeks before authority had been given to install the steel arch ribs and liner plates in the tunnel, on July 25, 1947, placed its order for the steel.
23. The plaintiff, on August 15,1947, promptly began the installation of the tunnel supports upon receipt of the steel and they were installed by October 8,1947. The space above the liner plates had to be filled with backpacking, rock and boulders which could be handled by one man crawling between the liner plates and the overhead in the rock tunnel. The backpacking operation was finished in October 18,1947.
24. Since the delay incident to authorizing the tunnel supports required concreting operations in winter weather, it then became necessary to winterize the concrete plant and this was accomplished by the plaintiff. Concreting operations in the tunnel commenced on December 15, 1947 and continued until May 8, 1948. Concreting operations began in the intake area sometime after July 25,1947 but this work could not move along expeditiously since the installation of the tunnel supports and backpacking interferred. The original plan of work operations submitted by the plaintiff called for the concreting of the intake and stilling basin from early July 1947 to the close of the 1947 work season. These two items were the inlet works on one end of the tunnel and the outlet works and stilling basin at the downstream end of the tunnel.
25. The original plan of operation called for the plaintiff to do the concreting of the spillway from April 15 to October 31, 1947. It should be noted that the location of the spillway was several hundred feet north of and generally parallel to the area of the stilling basin.
26. Subsequent to March 25, 1947, when the initial work of cleaning up the floor of the tunnel had been accomplished, after the tunnel had been holed through, there were additional falls of rock from the roof of the tunnel and the sides. As a result, before placing concrete lining, it was necessary to rescale both the sides and roof of the tunnel, pick up and load and haul out the rock that had fallen from the roof and *462 sides, also reclean the invert of tbe tunnel. This work was performed from August 23, 1947 to October 18, 1947. Plaintiff’s extra costs of performing this work were as follows:
Direct labor, plus insurance, taxes and overhead_$1,187.48
Field supervisory labor, plus insurance, taxes and overhead_ 121. 81
Cost of materials and other expenses, plus overhead_ 3. 26
Sublet work: Paid to subcontractor, plus overhead_ 4, 620. 53
Hired equipment: Paid to equipment owners, plus overhead_ 1,415.42
Use of owned equipment: At 1947 AED Manual rental rates less 15% profit_ 1,093.58
Total: Claim Item 2_$8,442. 08
27. The plaintiff received official authorization from the defendant to install the steel arch ribs with liner plates in the Almond Tunnel, but at its own expense, by letter from the Acting District Engineer dated August 11, 1947. Plaintiff, however, ordered steel ribs and liner plates from the manufacturer on July 25, 1947, which was as soon as plaintiff knew the size of adequate supports which had to be installed before concrete lining of the tunnel could proceed. By that time plaintiff had been advised by its engineering consultants, and the Liberty Mutual Insurance Company, that the design of tunnel protection recommended by the contracting officer was inadequate.
The plaintiff installed permanent tunnel supports in the central 610-foot portion of the Almond Tunnel in the form of steel arch ribs and liner plates, performing such installation between mid-August and mid-October 1947. This installation was exclusive of the two 50-foot ends for which the plaintiff was compensated.
28. The plaintiff’s extra costs for the labor, materials, and equipment used in the installation of the permanent tunnel supports installed were as follows:
Direct labor, plus insurance, taxes and overhead_ $1,190. 33
Field supervisory labor, plus insurance, taxes and overhead _ 134.92
Cost of materials and other expenses, plus overhead_ 23,228. 86
Sublet work: Paid to subcontractor, plus overhead_ 5,550.65
*463 Use of owned equipment, application of 1947 AED rental rates, less 15% profit factor- 1,143.93
$31, 248. 69
Less taxes, insurance and overhead_ — $3,447.90
$27, 800. 79
Plus 15% profit_ 4,170.12
$31,970.91
Plus taxes, insurance and overhead_ 3, 447.90
$35,418.81
29. As a result of the overbreak of rock in the Almond Tunnel there remained a space between the bore of the tunnel and the liner plates installed. The entire area between the liner plates and the roof and the sides of the tunnel required backpacking with material which would prevent the further fall of rock and properly support the roof. This area requiring backpacking was beyond the 50 feet of the inlet and outlet portals of the tunnel. The contract did not require backpacking where permanent supports were not required. Below the liner plates the concrete extended out to the bore of the tunnel and on the invert the entire area was filled with concrete. Above the spring line and where the liner plates were placed there was no concrete placed outside the plates. The backpacking of fragments of stone was packed in tightly and later, after the installation of the concrete lining of the tunnel, the plaintiff pumped sand into the area to fill the voids between the stone following which grout was pumped into the area under low pressure to make the area solid. The stone backpacking was installed during the weeks ending August 30,1947, through October 18,1947. The sand backpacking was installed during the weeks ending May 15, 1948 through July 3,1948.
30. The grouting which was performed subsequent to the sand backpacking was the pumping into a given volume of material of cement and water or sometimes cement, sand and water to solidify the mass, to fill in the voids between the particles. If the changed conditions resulting in the fall from the roof of the tunnel had not occurred grouting would not have been necessary and it was not a pay item in the original contract but an extra cost to the plaintiff.
*464 31. As the steel ribs were erected in the tunnel, the plaintiff’s engineers took cross sections of the tunnel at least every ten feet to determine the aperture of the whole tunnel so that it could be drawn on cross sections. From the information gained in this survey and computations by the plaintiff’s engineers, from the engineering information and the contract specifications, the volume remaining between the liner plates and the roof of the tunnel was computed and tabulations made of the total volume in cubic yards between the points 50 feet in from each end of the tunnel. Thus, determination was made of the actual volume of space above the liner plates to the roof of the tunnel in the 610 feet where the additional steel ribs were installed. This volume of space that required backpacking and grouting amounted to 14,553 cubic feet. The plaintiff’s engineering staff determined the percentage of voids which was the space not solidly filled by either stone or sand in backpacking that had to be filled with grout. The percentage was determined by acceptable standard engineering practices and observation to be 40 percent of the volume of the whole backpacked area between the liner plates and the roof of the tunnel. The cost of the grouting was determined by applying to 40 percent of the volume of the whole backpacked area the contract price of $2.50 per cubic foot, less 15 percent for a profit factor on that item.
32. Plaintiff’s extra costs of backpacking and low pressure grouting totaling $29,332.92 were as follows:

Stone Backpacking:

Direct labor, plus insurance, taxes and overhead_ $595.79
Field supervisory labor, plus insurance, taxes and overhead_ 58.47
Cost of materials, etc., plus overhead_ 1,990. 80
Sublet work: Paid to subcontractor, plus overhead_ 3, 890. 52
Use of owned equipment: At 1947 AED rental rates, less 15% profit factor_ 724.68

Sand Backpacking:

Direct labor, plus insurance, taxes and overhead_ 5, 669.29
Field supervisory labor, plus insurance, taxes and overhead_ 428.06
Cost of materials, etc., plus overhead_ 2,222.95
Owned equipment: At 1947 AED rental rates, less 15% profit factor_ 1, 382. 31
*465 Low Pressure Grouting — 14,558 cu. ft. X.40% (Voids) X $2.125 per eu. ft- 12,370.05
$29,332.92
Less taxes, insurance and overhead-- — $2,003.11
$27,329.81
Plus 15% profit_ 4,099.47
$31, 429.28
Plus taxes, insurance and overhead- 2, 003.11
$33,432. 39
33. The plaintiff placed additional concrete in the tunnel. This concrete was placed in the tunnel outside the pay lines established by the Government which was over and above the volume of concrete paid for by the defendant to the pay lines. The ultimate bore of the tunnel was larger in all its points throughout its complete circumference than the position of the pay line. It was applied on the floor, or the invert of the tunnel and on the sides and in the roof. The area above the spring line where the steel supports and liner plates were installed limited the volume of concrete placed to the liner plate position but below the liner plates, on the sides and on the invert of the tunnel, the plaintiff filled the entire space between the tunnel forms and the existing rock surface with concrete. Payment was made only to certain specified pay lines. The concrete placed beyond the specified pay lines has not been paid for by the Government.
The quantity of the excess concrete was computed as to volume by the plaintiff’s engineers computing the volume of the tunnel bore within the central 610-foot section as it existed at the time of concrete lining. The plaintiff submitted in the record as Exhibit 81 a document entitled “Summary Tunnel Volumes”. The computations show the difference between the cubic yards of tunnel concrete paid for by defendant and the amount actually placed, the difference being 644.61 cubic yards as a result of the changed conditions.
34. Plaintiff’s extra costs of placing the additional concrete were as follows:

*466
Ou. yds.

Computed volume of concrete placed in tunnel-3, 020. 31
Less volume of tunnel concrete paid to plaintiff by United States Engineer office on Estimate #36 — final-2, 375. 70
Additional concrete placed in tunnel- 644. 61
644.61 cu. yds. at the contract price of $25.00 per cu. yd.=$16,115.25— total claim including profit on Item 5.
35. The plaintiff’s original schedule of operations did not provide for winter concreting. The fact that permanent tunnel protection in the form of steel ribs and liner plates was not authorized earlier delayed the completion of the installation of the steel ribs and liner plates. It was apparent to plaintiff that the concrete would have to be poured in cold weather and plaintiff made provisions for that work. The plaintiff was required to, and did build a house to enclose its pumpcrete machine, install a boiler for preheating the water going into the concrete, enclose the batching plant and the cement plant and install steam boilers and pipes to protect and heat the materials in the bins and the stockpiles before they were incorporated in the concrete. This preparatory work was done between mid-October and December 15,1947. Plaintiff’s work in carrying out the heating of the concrete before placement and subsequent to placement due to the fact that plaintiff had to place concrete in subfreezing weather continued through the week ending April 24, 1948. Plaintiff commenced the concreting of the Almond Tunnel on December 15, 1947, and completed it on May 8, 1948.
36. Plaintiff’s extra costs to prepare for and handle heat for winter concreting were as follows:
Direct labor and supervisory labor, taxes, insurance and overhead_$26,008.45
Cost of materials and other expenses plus overhead- 6,693. 08
Use of owned equipment: At 1947 AED rental rates, less 15% profit factor- 4,487.76
Total claim Item 6_$37,189.29
37.As a result of concreting the tunnel, including the inside of the tunnel and the inlet area, during winter months the plaintiff suffered a loss of efficiency and as a consequence incurred extra costs. The loss of efficiency was attributable *467 to men and machines not producing as much in winter or subfreezing weather as would be produced during favorable weather, to equipment freezing and being difficult to start, to the fact that the equipment had to be shut down earlier in cold weather in order to clean and protect it for cold nights, and to the fact that carpenters erecting forms had to work with gloves thus impeding their activity. On the basis of an eight hour day the plaintiff would get only five hours of work out of the equipment 'and employees engaged in the winter concreting operation.
Plaintiff estimated that there was a loss in efficiency of 25 percent in its labor force and its equipment and everything else which went into the cost of handling concrete in the winter time. This estimate was based upon the experience of plaintiff’s engineers in carrying on concrete placement operations during the particular winter season. This estimate of loss of efficiency was corroborated by Mr. Miles Clair, a consulting engineer with extensive experience with respect to concreting, who was former chairman of the American Concrete Institute Committee on Winter Concreting.
Winter weather concrete operation at a location such as Almond Dam, as compared with concreting in favorable weather, reduces efficiency 25 percent below normal efficiency.
38. The plaintiff computed its cost due to the loss of efficiency in winter concreting by applying a 25 percent loss of efficiency to plaintiff’s cost of concrete which was 85 percent of plaintiff’s bid price of $25.00 a cubic yard or $21.25, thus arriving at a figure of $5.3125 (25 percent of $21.25) a cubic yard as a factor, and then applied this figure to the number of cubic yards that were poured during the period December 15, 1947 to April 13, 1948.
The extra costs plaintiff incurred by reason of loss of efficiency in winter concreting were as follows:

Gu. yds.

Total concrete placed during period December 12, 1947 through. April 13, 1948_ 2, 984. 6
Less concrete placed in Erie Railroad culvert during period_ 15.0
Concrete placed during period in connection with tunnel_ 2, 969. 6 2,969.6 cu. yd. at $5.3125 per cu. yd.=$15,776.00, total claim Item 7.
*468 39. The plaintiff paid for the services of the consulting engineers who examined the tunnel to determine the need for permanent tunnel protection. The amount paid was $2,820.47. The consulting engineers employed by the plaintiff to advise on tunnel supports as being required were Messrs. J. Murray Kidell, James G. Tripp, and Miles N. Clair, all engineering consultants. The plaintiff’s costs were based upon the invoices submitted by the engineering consultants. The charges were reasonable. Adding 15 percent profit to this amount results in a figure of $3,243.54.
40. Items of claims Nos. 2 through 7 inclusive, and item 16, totaling $149,617.36, are reasonably related to the costs of installing the tunnel supports and also the delay incident thereto as well as the disruption to the balance of the contract work. Other items claimed by the plaintiff bore no reasonable relation to the matter of failure to order installation of tunnel supports earlier.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and it is therefore adjudged and ordered that plaintiff recover of and from the United States the sum of one hundred forty-nine thousand six hundred seventeen dollars and thirty-six cents ($149,617.36).

 In accordance with established engineering practice, when references are made to “right” or “left” it is assumed that one is facing downstream.